United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

---

No. 05-30294

---

**JOHN DOE, Individually and as next friend of his minor children James Doe and Jack Doe,**

**Plaintiff-Appellee,**

**versus**

**TANGIPAHOA PARISH SCHOOL BOARD; JIMMIE RICHARDSON, Reverend, School Board Member, District A; ROBERT POTTS, School Board Member, District B; LEONARD GENCO, School Board Member, District C; AL LINK, School Board Member, District D; DON WILLIAMS, School Board Member, District E; ROBERT CAVES, School Board Member, District F; MAXINE DIXON, School Board Member, District G; SANDRA BAILEY-SIMMONS, School Board Member, District H; CARL BARDWELL, School Board Member, District I; LOUIS JOSEPH, Superintendent, Tangipahoa Parish School System**

**Defendants-Appellants.**

---

**Appeal from the United States District Court**
**for the Eastern District of Louisiana**
**(2:03-CV-2870)**

---

Before BARKSDALE, STEWART, and CLEMENT, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This appeal presents an Establishment Clause issue of first impression in our circuit. The Tangipahoa Parish School Board, its Board members, and the Tangipahoa Parish School System's superintendent (collectively, the Board) challenge a permanent injunction against the Board's opening its meetings with prayer. Consistent with the long-standing rule of deciding a constitutional

issue on its most narrow basis, the injunctive relief must be narrowed greatly.  This disposition is reached through differing opinions by each panel member.

The Board's having conceded the prayers are unconstitutional under the test employed in *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971), this opinion assumes, without deciding, that *Marsh v. Chambers*' legislative/deliberative-body exception applies.  463 U.S. 783 (1983).  Under *Marsh*, the four prayers at issue are unconstitutional; the balance of the injunction is vacated.  Applying a *Lemon*, rather than *Marsh*, analysis, Judge Stewart concurs in these four prayers being unconstitutional, but would affirm the injunction.  Judge Clement would vacate the injunction, opining the prayers at issue fit within *Marsh*'s ambit of protection.

As a result, the portion of the injunction relating to the four prayers in the parties' joint stipulations is **AFFIRMED**; the remainder of the injunction is **VACATED**.  This matter is **REMANDED** to the district court for entry of an injunction consistent with this opinion.  **AFFIRMED in PART; VACATED in PART; and REMANDED.**

I.

In October 2003, John Doe, a resident and taxpayer of Loranger, Tangipahoa Parish, Louisiana, filed this action against the Board, including on behalf of his two minor sons.  The Board is a "[p]olitical subdivision" of the State, LA. CONST. art. 6, §

2

44(2), and a statutorily defined "[p]ublic body", LA. REV. STAT. ANN. § 42:4.2.

Doe challenged several prayer events permitted by the School System: pre-game prayers over the public-address system at athletic events; prayers including student athletes prior to, and after completion of, such events; prayers by students to the student body over the public-address system; and the Board's opening its meetings with a prayer (prayer practice). All but the challenge to the Board's prayer practice were resolved by a consent judgment in August 2004. It enjoined those other prayer events, except for prayers given by students at graduation ceremonies to the extent permitted by *Jones v. Clear Creek Independent School District*, 977 F.2d 963, 972 (5th Cir. 1992) (permitting student-initiated prayers at graduation ceremonies so long as they do not have a coercive effect), *cert. denied*, 508 U.S. 967 (1993).

Regarding the Board's prayer practice, the parties in September 2004 entered into the following joint stipulations, the sole evidence presented in district court. The Board is a deliberative body that acts in the public interest. It is responsible for operating and governing the School System's 35 schools, including the high school attended by Doe's two sons. The Board meets twice each month in the School System's central office. The Board's president normally presides; the vice-president presides in his absence. The meetings are open to the public, and

students may attend. (Although it is possible under Louisiana law for a student to be a Board member, LA. REV. STAT. ANN. § 17:52(E)(1), the stipulations are silent as to whether there is a student member on the Board.)

Each meeting begins with a prayer, followed by a recitation of the Pledge of Allegiance. This prayer practice has been followed since at least 1973; prayers have been offered by Board members, the Board president, the School System's assistant superintendent, School System teachers and students, and ministers. An individual may present a prayer only after being selected by a Board member. In a sampling of prayers delivered between January 2002 and August 2004, ten were by Board members, nine by students or former students, four by principals or assistant principals, three each by teachers and the assistant superintendent, and one each by the Board president and a minister.

The stipulations contained four of the prayers given; each contained a reference to "Jesus Christ" or "God" and "Lord". The School System's assistant superintendent presented the following prayer on 18 February 2003:

> Heavenly Father, we thank you for the many blessings we've received. We thank you for our health. We thank you for our strength. We thank you for our peace of mind. We thank you for allowing us to assemble here tonight, and we ask that you give this Board and our Superintendent all the wisdom and the knowledge, and the understanding they need to make the correct decisions for our students and for our parents.

4

Also Lord, we ask that you throw your strong arm of protection around our President and around his Cabinet Members, to help him make the right decisions that will affect thousands of U.S. soldiers, airmen, and marines, at this time. We ask that you give him the same wisdom that you gave Solomon in making decisions that's [sic] best for our country. Also, we thank you for the greatest gift of all — your darling son, Jesus Christ. For we all know that He was born, died, and rose again, so that we all may be forgiven for our sins. And Lord, as we leave this meeting tonight, we ask that you guide us safely to our various abodes. These things we ask in your darling son, Jesus Christ's[,] name. Amen.

A Board member's son presented the following prayer on 23 September 2003:

Almighty God, we make our earnest prayer that Thou wilt keep the United States in thy holy protection, that Thou wilt incline in the hearts of the citizens to cultivate a spirit of subordination and obedience to government, and entertain a brotherly affection and love for one another and for their fellow citizens of the United States at large.
And finally that Thou wilt most graciously be pleased to dispose us all to do justice, to love mercy, and to demean ourselves with that charity, humility, and pacific temper of mind which were the characteristics of the Devine [sic] Author of our blessed religion, and without an [sic] humble imitation of whose example in these things, we can never hope to be a happy nation.
Grant our supplications, we beseech Thee, through Jesus Christ our Lord. Amen.

A School System elementary-school principal presented the following prayer on 18 May 2004:

Heavenly Father, we thank you for all the blessings that you have given us. Let us not take for granted that each breath that we take

5

is a blessing from you, and even though we don't understand the hardships that are put before us at different times in our lives, let us always remember that the experiences that we go through have a purpose and even though we don't understand the purpose, it is your desire that we have each and every experience on this earth, for without you we have nothing.

Watch over our soldiers that are overseas. Please keep them safe. Please soften the hearts of our adversaries and help them see that we are trying to do what we believe is good and right and to bring freedom to people that have been oppressed.

Please guide all the people in this room that are in charge of setting the education of our children and setting the future of our children. Let all of us keep in mind that we have one focus and that is what is best for our children. Let us keep them at the front of all our decision-making processes. Let us do everything to bring glory and honor to your name, and we ask all of these things through Your Son, Jesus Christ. Amen.

In the final prayer included in the stipulations, a Board member presented the following on 15 June 2004:

Father, we thank You for Your many blessings. Father, we are grateful for the opportunity to live in this country, the greatest country on this planet. God, we have the freedom to choose, to live our lives as we please. We have the opportunity to pursue any goals we so desire.

Lord, this big Board — group of people meeting here tonight has an awesome responsibility to see that each and every child in the parish has the opportunity, and the chance to prepare themselves to the fullest to live their adult lives. God, we just pray that we in this parish will have the guidance and the wisdom to make it happen. In your name we pray. Amen.

It was *not* stipulated that the above four prayers were representative, or typical, of those offered at Board meetings. Each prayer in the stipulations is Christian in tenor, if not in fact.

On 3 August 2004, approximately ten months after this action was filed and only approximately one month before the consent judgment and joint stipulations, the Board considered — but unanimously rejected — a written policy that would have permitted *only* Board members to begin "meetings with a brief non-sectarian, non-proselytizing invocation to solemnize the occasion". Accordingly, the Board's unwritten practice of selecting speakers who give prayers of their own unrestricted choosing remained in effect.

This action seeks injunctive and declaratory relief. The district court held the prayers: fall outside the legislative-prayer context permitted by *Marsh v. Chambers*, 463 U.S. 783 (1983); and otherwise violate the Establishment Clause pursuant to the traditional analysis under *Lemon v. Kurtzman*, 403 U.S. 602 (1971). The court permanently enjoined the Board from opening its meetings with *any* prayer: "the [Board's] practice of opening each ... meeting with a religious invocation violates [Doe's] rights under the Establishment Clause of the First Amendment". *Doe v. Tangipahoa Parish Sch. Bd.*, No. 03-2870, slip op. at 25 (E.D. La. 24 Feb. 2005).

7

II.

Neither in district court, nor on appeal, has the Board challenged Doe's standing to bring this action. Nor did the district court address it. Because standing is jurisdictional, however, we must address it *sua sponte* before considering this Establishment Clause issue of first impression in our circuit. **Doe v. Sch. Bd. of Ouachita Parish**, 274 F.3d 289, 292 (5th Cir. 2001); *see* **Bender v. Williamsport Area Sch. Dist.**, 475 U.S. 534, 547 (1986) ("This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.") (quoting **Mansfield, C. & L. M. Ry. Co. v. Swan**, 111 U.S. 379, 382 (1884)).

A.

Neither of the separate opinions contests the following standing analysis. This inquiry has two components. First addressed are constitutional limitations, derived from the Constitution's case-and-controversy requirement in Article III; second, judicially-created prudential limitations are examined. **McClure v. Ashcroft**, 335 F.3d 404, 408 (5th Cir. 2003).

To establish Article III standing, Doe "must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress". **Elk Grove Unified Sch. Dist. v. Newdow**, 542 U.S. 1, 12 (2004) (quoting **Lujan**

8

*v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[T]he concept of injury for standing purposes is particularly elusive in Establishment Clause cases". *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 294 n.31 (5th Cir. 2001) (alteration in original) (quoting *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991), *cert. denied*, 505 U.S. 1219 (1992)). Our "rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable". *Id.* (quoting *Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir. 1997)). For example, direct exposure to a mandatory school-uniform policy satisfied the "intangible injury" requirement for Establishment Clause standing. *Id*. Parents and students challenged this policy, claiming, *inter alia*, its opt-out procedures "favor[ed] certain established religions at the expense of other religions and thus violate[d] the Establishment Clause". *Id.* at 282.

In the context of the Establishment Clause, "we attach considerable weight to ... standing ... not [having] been an issue in the Supreme Court in similar cases". *Murray*, 947 F.2d at 151. For example, standing existed for a claimed Establishment Clause violation that had impaired "use or enjoyment of a public facility". *Sch. Bd. of Ouachita Parish*, 274 F.3d at 292.

Standing is bolstered when, as here, the plaintiffs are public school students and their parents, "who enjoy a cluster of rights

9

vis-a-vis their schools" and thus transcend the realm of mere bystanders. *Id*. A parent may be permitted to bring an action as the next friend of his or her children; however, for an action for themselves as well, parents must "assert an injurious deprivation of their own legal rights or interests". *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 606 (5th Cir. 2004).

Doe appears to assert two standing bases: (1) as a parent of two students in the School System, he (as well as his two sons) has attended, and been offended by, Board meetings; and (2) as a resident and taxpayer of Tangipahoa Parish, where the school district is located. (Because we hold Doe has standing under the first basis, we need not address taxpayer standing.)

In his original 14 October 2003 complaint, Doe stated: he was "a domiciliary and resident" and "a taxpayer and registered voter" of Tangipahoa Parish, and also the father of two school-system students; and he and his sons found "objectionable the non-secular manner in which the Board's meetings are conducted.... By commencing the meetings with a prayer, the Board is conveying its endorsement of religion". He noted explicit references to God and Jesus Christ at Board meetings. In seeking injunctive relief, Doe explained his family "ha[d] suffered, and will continue to suffer, immediate and irreparable harm in the event that [the Board is] allowed to continue permitting, authorizing, encouraging, and

10

acquiescing in the delivery of ... religious invocations at the start of each board meeting".

As permitted by Federal Rule of Civil Procedure 15(a), Doe's 26 November 2003 amended complaint was filed before the Board answered. The amendment added: "Plaintiffs, John Doe, James Doe, and Jack Doe, have been in attendance at school board meetings which were opened with a prayer".

In its 26 January 2004 answer, the Board admitted its meetings were open to the public; it denied, but only for a lack of information, Doe's allegations regarding attendance and involvement. No mention was made whether Doe had standing to bring this action.

Instead, the parties on 30 August 2004 entered into the earlier-discussed consent judgment, which resolved all claims in Doe's complaint except his challenge to the Board's prayer practice. Four days later, on 3 September 2004, the parties entered into the stipulations discussed *supra*. These stipulations did not address the standing issue directly, noting only that Doe was "a person of full age of majority and a resident and domiciliary of ... [Tangipahoa] Parish ... wherein he is a registered voter and taxpayer" and parent of two students within the School System. The remainder of the stipulations do *not* address Doe personally.

11

The Board's failure to challenge Doe's assertions that he attended Board meetings and was offended by their content was never challenged, beyond the lack-of-information denial in its answer, filed more than eight months before the consent judgment. As this action progressed, the Board had many opportunities — including during the bench trial — to contest Doe's standing; the Board's failure to challenge either Doe's attendance at Board meetings or his assertion that he was offended is the equivalent of an implied admission.

Although we have not located any precedent for this implied-admission concept regarding standing, we find it sufficiently analogous to the approach taken by Federal Rule of Civil Procedure 15(b). That rule states, in part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings". Similarly, the Board's decision to proceed on the merits of Doe's claim, without challenging either that he attended Board meetings or was offended by them, permits an inference that the Board conceded these allegations in Doe's complaint. Further, the Board's entering into the consent judgment and stipulations with Doe permits the inference that, had the Board disagreed with Doe's allegations that he attended Board meetings and was offended by its prayer practice, it would not have entered into the consent judgment and stipulations. We may make such inferences from the

12

record.  *Cf. **Ladue v. Chevron, U.S.A., Inc.***, 920 F.2d 272, 277 (5th Cir. 1991) (inferring from the record the cause of injury in a products liability action).  Nor do we have any reason to believe the interests of Doe, in his role as next friend, conflict with those of his sons.  In contrast, such a conflict arose in ***Newdow*** with evidence that the interests of a non-custodial father conflicted with those of his child.  542 U.S. at 15.

Based on the unchallenged allegations in the complaint, Doe has shown an injury; he and his sons have attended Board meetings and have been offended by the Board's prayer practice, which they "find wholly objectionable".  This suffices for a noneconomic, intangible injury under our Establishment Clause jurisprudence. ***Littlefield***, 268 F.3d at 294 n.31.

Doe's injury, caused by that practice, would be redressed by an injunction against it.  Nothing has been offered to suggest that the Board did not comply with the one imposed by the district court, so Doe's injury appears sufficiently redressed by it.

Accordingly, three prudential factors are considered:  (1) whether Doe's complaint fits "within the zone of interests protected by the ... constitutional provision at issue"; (2) "whether [his] complaint raises [more than] abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches"; and (3) "whether [Doe] is asserting his ...  own legal rights and interests", as opposed to

13

those of third parties.  *Murray*, 947 F.2d at 151 (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1024 (5th Cir. 1991)).  None of the prudential limitations bars Doe's standing:  his assertion that the prayer practice of the Board, a political subdivision of the state, impermissibly "inject[s] religion" into Board meetings, fits within the zone of Establishment Clause claims; he raises not abstract, generalized grievances, but his own experiences at Board meetings; and, finally, he asserts both his own injury, as well as those of his sons as next friend.  *Id.*

B.

Applied to the States through the Fourteenth Amendment, *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947), the First Amendment's Establishment Clause states:  "Congress shall make no law respecting an establishment of religion".  U.S. CONST. amend. I.  This has become synonymous with the proposition that neither the federal nor a state government, nor their entities, may "promote or affiliate ... with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, ... and may not involve itself too deeply in such an institution's affairs".  *County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 590-91 (1989) (internal footnotes omitted).  The Amendment "guarantee[s] religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such

14

as Islam or Judaism'". *Id.* at 590 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 52 (1985)). "The touchstone for our [Establishment Clause] analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County v. Am. Civil Liberties Union of Ky.*, 125 S. Ct. 2722, 2733 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).

The permanent injunction at issue is reviewed for abuse of discretion; such an abuse occurs if, *inter alia*, the district court relies on erroneous conclusions of law. *McClure*, 335 F.3d at 408. Of course, its constitutional-law conclusions are reviewed *de novo*. *Qutb v. Strauss*, 11 F.3d 488, 491 (5th Cir. 1993), *cert. denied*, 511 U.S. 1127 (1994). An Establishment Clause challenge may be evaluated using one of several judicially-created tests. As it did in district court, the Board relies *solely* upon the legislative-prayer exception enunciated in *Marsh*.

The Establishment Clause issue at hand being one of first impression for our circuit, little mention has been made of *Marsh*. One of our few opinions to discuss it explained the prayers in *Marsh* showed "absolutely no evidence of an intent to proselytize, or advance, any religion, and no threat of an establishment of religion". *Murray*, 947 F.2d at 155 (holding, *inter alia*, a Christian cross contained in a city's insignia did not violate the

15

Establishment Clause). Accordingly, we look not only to Supreme Court precedent, but also to that from other circuits.

After holding *Marsh* did not apply to the Board's prayer practice, the district court, as urged by Doe, held it violated each prong of the Supreme Court's traditional Establishment Clause analysis first outlined in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (requiring a challenged practice to: (1) "have a secular legislative purpose"; (2) have a "principal or primary effect ... that neither advances nor inhibits religion"; and (3) "not foster an excessive government entanglement with religion") (internal citations and quotation marks omitted).

As noted, the Board defends its prayer practice solely under *Marsh*, however. It concedes that practice would *not* survive the *Lemon* test. For this reason, and because this opinion assumes the Board, as a stipulated public deliberative body, falls under *Marsh*, this opinion looks to its legislative-prayer exception in determining whether the Board's prayer practice violates the Establishment Clause. *See, e.g., Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*, 52 F. App'x 355, 356 (9th Cir. 2002) (applying *Marsh* to a school board as a deliberative body); *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 278 (4th Cir.) (applying *Marsh* to a county board of supervisors as a deliberative body), *cert. denied*, 126 S.Ct. 426 (2005); *Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir. 1998) (en banc)

16

(applying **Marsh** to a city council), *cert. denied*, 526 U.S. 1039 (1999). Unlike the district court's analysis and Judge Stewart's opinion, assuming **Marsh** applies avoids being placed "between the proverbial rock and a hard place", ***Coles v. Cleveland Bd. of Educ.***, 171 F.3d 369, 371 (6th Cir. 1999) — the Court's legislative-prayer analysis and its Establishment Clause jurisprudence in the public-schools context.

1.

"We are a religious people whose institutions presuppose a Supreme Being." ***Zorach v. Clauson***, 343 U.S. 306, 313 (1952). In that regard, "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789". ***Lynch v. Donnelly***, 465 U.S. 668, 674 (1984). This role is reflected in **Marsh**, which addressed the narrow question of whether the Nebraska state legislature's practice of opening each legislative session with a prayer by a paid chaplain violated the Establishment Clause. 463 U.S. at 784. Relying in large part on the "unique history" of prayer at legislative sessions and historical evidence of the intent of the Establishment Clause drafters, the Court held this practice constitutionally permissible. ***Id.*** at 790-91.

> In [the] light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening *legislative* sessions with prayer has become part of the fabric of our society. To invoke

17

> Divine guidance on a public body entrusted with making the laws ... is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

*Id.* at 792 (emphasis added). Likewise, earlier in its opinion, the Court stated: "The opening of sessions of *legislative and other deliberative public bodies* with prayer is deeply embedded in the history and tradition of this country". *Id.* at 786 (emphasis added).[1]

The challenged prayers in *Marsh* contained no references to Jesus Christ; although the chaplain had made Christian references in the past, they had been removed at the request of a non-Christian legislator. *Id.* at 793 n.14. The Court emphasized: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794-95. Likewise, consistent with our holding in *Jones*, 977 F.2d at 972, the consent judgment between Doe and the Board provides that student-led prayers may be

---

[1] Although Judge Stewart opines that *Marsh* applies only to *legislative* bodies, *Marsh* contemplated deliberative public bodies more generally. In any event, as stated, this opinion *only assumes* that *Marsh* applies. To decide, as Judge Stewart does, whether it applies is *not* necessary and, as discussed *infra*, is violative of the well-settled rule that constitutional questions, especially those involving the Establishment Clause, should be decided on the most narrow basis possible. Accordingly, this opinion does *not* respond to Judge Stewart's reasons for claiming *Marsh* does *not* apply to the Board's prayer practice.

18

permitted during graduation ceremonies, so long as they do not have a coercive effect.

References to God in a motto or pledge, for example, have withstood constitutional scrutiny; they constitute permissible "ceremonial deism" and do not give an impression of government approval. *County of Allegheny*, 492 U.S. at 595 n.46, 603; *see Lynch*, 465 U.S. at 716 (Brennan, J., dissenting) (suggesting phrases such as "In God We Trust" are best explained as "ceremonial deism", or practices "protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content"); *N.C. Civil Liberties Union Legal Found. v. Constangy*, 947 F.2d 1145, 1151 (4th Cir. 1991) (explaining that use of these oft-repeated phrases "merely reflect[s] this fact of our history and no longer ha[s] any potentially entangling theological significance") (quoting *Hall v. Bradshaw*, 630 F.2d 1018, 1023 (4th Cir. 1980), *cert. denied*, 450 U.S. 965 (1981)), *cert. denied*, 505 U.S. 1219 (1992). Our circuit has similarly examined legislative prayers alongside other "government use[s] of religious acknowledgment" such as "In God We Trust" on our currency and opening our sessions with "God save the United States and this honorable court". *Murray*, 947 F.2d at 154-55.

Since *Marsh*, the legislative-prayer exception has been sparsely applied; the Court has not held it controlling for an

19

Establishment Clause challenge.  Instead, the Court has continued to define **Marsh** as a narrow exception for nonsectarian legislative invocations.  In **County of Allegheny**, applying the **Lemon** test to a challenged holiday display in local government buildings, the Court discussed its earlier opinion in **Marsh**:  "However history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed."  492 U.S. at 603 (internal footnote omitted).  The history of legislative prayer, which justified the nonsectarian prayers in **Marsh**, "can[not] justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief".  **Id.** (explaining that the prayers in **Marsh** "did not violate this principle because the particular chaplain had 'removed all references to Christ'" (quoting **Marsh**, 463 U.S. at 793 n.14)).

Similarly, in **Edwards v. Aguillard**, 482 U.S. 578 (1987), the Court explained that **Marsh's** holding was based on "the historical acceptance of the practice" and deemed **Marsh** inapplicable to public schools, where there existed no similar longstanding tradition of prayer.  **Id.** at 583 n.4 ("Such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted.").  Likewise, in **Lee v.**

20

*Weisman*, 505 U.S. 577 (1992), the Court noted *Marsh's* application to legislative bodies but refused to extend its legislative-prayer exception to public school graduation ceremonies. *See id.* at 596-97. Justice Scalia's dissent analogized the legislative prayers in *Marsh* to the Court's tradition of opening its sessions with the "ceremonial deism" of "God save the United States and this Honorable Court", which dates back to Chief Justice Marshall. *Id.* at 635 (Scalia, J., dissenting).

Later that year, on remand from the Supreme Court, our court decided *Jones*, in which we reflected on the Court's holding in *Lee* that a school principal, by inviting a local clergy member to deliver a graduation prayer, violated the Establishment Clause. *Jones*, 977 F.2d at 965. We held *Lee* did not render infirm the graduation prayers at issue in *Jones* because they imposed no elements of unconstitutional coercion found in *Lee*. The student-driven nature of the prayers — the graduating class decided whether any prayer would be given — and the lack of involvement with religious institutions allowed them to pass constitutional muster. *Id.* at 968-72.

In its most recent Establishment Clause decisions, the Court has reaffirmed *Marsh's* viability for legislative prayer. In *McCreary County*, it noted *Marsh's* legislative prayer was upheld "despite its religious nature". 125 S. Ct. at 2733 n.10. In *Van Orden v. Perry*, 125 S. Ct. 2854 (2005), decided the same day, the

21

Court explained it was not constitutionally problematic that the legislative prayers in **Marsh** "had once been offered in the Judeo-Christian tradition", because the references to Christ had been removed after the litigation commenced. **Id.** at 2862 n.8. The Court then explained that **Marsh** stands for the following proposition: "Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause". **Id.** at 2863 (noting that the Ten Commandments, at issue in **Van Orden**, have an "undeniable historical meaning"). Because both **McCreary County** and **Van Orden** involved Ten Commandment displays, *not* legislative prayers, however, the Court declined to expand **Marsh's** reach.

Nor have our sister circuits expansively applied **Marsh**, even for prayer in "legislative and other deliberative public bodies". **Marsh**, 463 U.S. at 786. When they do apply **Marsh**, other circuits typically emphasize it permits only nonsectarian, non-"proselytiz[ing legislative prayers that do not] ... advance ... or ... disparage any ... faith or belief". **Id.** at 794-95; *see also, e.g.,* **Snyder v. Murray City Corp.**, 159 F.3d 1227, 1235 (10th Cir. 1998) (en banc) (applying **Marsh** to uphold city council's decision to disallow a particular opening prayer proselytizing its religious views while disparaging others), *cert. denied*, 526 U.S. 1039 (1999). Two circuits have squarely addressed opening prayers

22

at school-board meetings and *Marsh's* applicability to them; the Sixth and Ninth Circuits employed different approaches to hold the prayers violated the Establishment Clause.

In *Coles v. Cleveland Board of Education*, the Sixth Circuit in 1999 concluded school-board prayer was appropriately considered among the Supreme Court's decisions addressing "school-related activities", because board meetings "take place on school property and are inextricably intertwined with the public school system". 171 F.3d at 377. *Coles* found two relevant "overriding principles" in the Supreme Court's school-prayer jurisprudence: "first ... that 'coercion' of impressionable young minds is to be avoided, and ... second ... that the endorsement of religion is prohibited in the public schools context". *Id.* at 379. After briefly outlining *Marsh's* legislative-prayer exception, *Coles* held *Marsh* not controlling because the school board did not fit within the scope of legislative and deliberative bodies to which *Marsh* should apply. *Id.* at 381 ("Simply stated, the fact that the function of the school board is uniquely directed toward school-related matters gives it a different type of 'constituency' than those of other legislative bodies — namely, students."). Applying the *Lemon* test instead, *Coles* held the school board's prayers violated the Establishment Clause. *Id.* at 385. (Seven judges dissented, however, from the denial of rehearing en banc. 183 F.3d 538 (6th Cir. 1999).)

23

More recently, in contrast to the *Coles* approach, the Ninth Circuit, in an unpublished opinion, applied *Marsh* to a school board's prayers that typically included "in the name of Jesus" and were presented by a Christian. *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*, 52 F. App'x 355, 356 (9th Cir. 2002). In so doing, the court "assum[ed] without deciding that [*Marsh*] is applicable" to the school board as a *deliberative body*. *Id.* ("On the facts of this case, even if the school board is like a state legislature for this purpose, the invocations are unconstitutional."). As in the action at hand, but unlike in *Marsh*, the sectarian references in the prayers at issue in *Bacus* were *not* removed after they were challenged, and the prayers consistently advanced the Christian faith. *Bacus* held: "[T]he prayers did not disparage other religious faiths, and did not proselytize. But that is not enough" to survive constitutional muster. *Id*. at 357. The prayers in *Bacus* failed the additional requirement that they "not 'advance any one ... faith or belief'". *Id.* (quoting *Marsh*, 463 U.S. at 794-95). The school board's decision to solemnize its meetings by using Jesus' name impermissibly "display[ed] 'the government's allegiance to a particular sect or creed'". *Id.* (quoting *County of Allegheny*, 492 U.S. at 603). Stating that "[i]njunctions against governmental prayers violative of the Establishment Clause are routinely

24

granted", *id.*, the Ninth Circuit reversed the district court's denial of such relief.

Other circuits have also affirmed *Marsh's* viability in the limited sphere of *legislative* prayer. Quite recently, the Seventh Circuit endorsed a narrow view of *Marsh*, holding its protections encompass only *nonsectarian* legislative prayer. *Hinrichs v. Bosma*, 440 F.3d 393, 399 (7th Cir. 2006). In *Hinrichs*, the Speaker of Indiana's House of Representatives requested that ordered injunctive relief be stayed; taxpayers had challenged the Indiana House's 188-year-old practice of opening official meetings with brief prayers, and the district court permanently enjoined sectarian prayers. *Id.* at 395-96. The prayers were typically delivered by local clerics of various faiths, but Christian prayers dominated: of 45 prayers in 2005 for which transcripts were available, 29 were "identifiably Christian". *Id*. at 395. Relying on the Court's language in *Marsh* and *Allegheny*, and noting that no other circuit had taken a contrary position, the Seventh Circuit held the prayers fell outside *Marsh's* protections. *Id.* at 400-02; *see id.* at 399 ("[W]e have read *Marsh* as hinging on the nonsectarian nature of the invocations at issue there".).

The Tenth Circuit in *Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir. 1998) (en banc), *cert. denied*, 526 U.S. 1039 (1999), applied *Marsh* in denying a speaker's request to present an

25

invocation at a city-council meeting because of its disparaging, proselytizing content. *Id.* at 1236. The court held: "the kind of legislative prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that aggressively advocates a specific religious creed", *id.* at 1234; in contrast, a permissible prayer "typically involves nonsectarian requests for wisdom and solemnity, as well as calls for divine blessing on the work of the legislative body", *id.*; and *Marsh* approved of a "genre" of prayer that "is a kind of ecumenical activity that seeks to bind peoples of varying faiths together in a common purpose", *id.*

The Fourth Circuit upheld a county board of supervisors' invocation policy that permitted only "non-sectarian [prayers] with elements of the American civil religion". *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 278 (4th Cir. 2005) (quoting the board's policy). "[S]eeking to avoid the slightest hint of sectarianism", the board, by letter, directed those presenting the prayer to avoid making references to Jesus Christ. *Id.* at 279. The court noted that earlier, in *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), *cert. denied*, 125 S. Ct. 2990 (2005), it had contrasted this constitutionally permissible policy with prayers found impermissible because "sectarian references ... were far more than occasional or incidental". *Simpson*, 404 F.3d at 283.

In **Wynne**, before filing suit against the town council, the plaintiff had proposed nonsectarian alternatives to the council's practice of making references to "Christ" or "Jesus Christ"; as did the Board in the appeal at hand, the council refused those suggestions; and exclusively Christian prayers continued to be presented. 376 F.3d at 295. Unlike the "nonsectarian" and "civil" invocations in **Marsh**, those permitted by the town council "'frequently' contained references to 'Jesus Christ' and thus [impermissibly] promoted one religion over all others". **Id.** at 298-99 (internal footnote omitted).

The remaining circuits have offered only a limited discussion of legislative prayer as permitted by **Marsh**. *See, e.g.*, **ACLU Neb. Found. v. City of Plattsmouth**, 419 F.3d 772, 777 (8th Cir. 2005) ("[T]he Court has approved certain government activity that directly or indirectly recognizes the role of religion in our national life".); **Freethought Soc'y of Greater Phila. v. Chester County**, 334 F.3d 247, 266 (3d Cir. 2003) (declining to apply **Marsh** to a Ten Commandments display but noting "that the Supreme Court has acknowledged the proposition that history can transform the effect of a religious practice"); **Commack Self-Serv. Kosher Meats, Inc. v. Weiss**, 294 F.3d 415, 430 (2d Cir. 2002) (applying **Lemon**, but explaining that legislative prayers in **Marsh** were permissible because they "did not confer a substantial and impermissible benefit on religion in general or on Christianity in particular"),

27

*cert. denied*, 537 U.S. 1187 (2003); **Jager v. Douglas County Sch. Dist.**, 862 F.2d 824, 828-29 (11th Cir.) (declining to apply **Marsh** to prayers prior to high-school football games because, unlike the "unique history" of invocations at legislative sessions, those "at school-sponsored football games were nonexistent when the Constitution was adopted"), *cert. denied*, 490 U.S. 1090 (1989); **Carter v. Broadlawns Med. Ctr.**, 857 F.2d 448, 453 (8th Cir. 1988) ("We do not believe the evidence recounted in **Marsh** can support a rule permitting state sponsored chaplaincies of any stripe.").

2.

For the Board's prayers to fall outside those permitted by **Marsh**, we must conclude either: (1) the Board, *although stipulated to be a deliberative body*, does *not* fit within **Marsh's** description of "legislative and other deliberative public bodies", 463 U.S. at 786, either because **Marsh** did *not* intend to encompass any entities beyond legislatures *or* because the prayers fit within the public-school context to which **Marsh** does *not* apply; or (2) the prayers are *not* nonsectarian and non-proselytizing, in violation of **Marsh** and subsequent guidance from the Court. Because the overtly sectarian prayers included in the stipulations fall outside **Marsh's** limited reach, we need *not* decide: (1) whether the Board fits within **Marsh's** legislative scope; and (2) thus whether other prayers *might* be constitutionally permissible. This is in keeping

28

with the long-standing and extremely sensible rule that "constitutional issues should be decided on the most narrow, limited basis". *United States v. Roberts*, 274 F.3d 1007, 1012 (5th Cir. 2001). For obvious reasons, this holds especially true for Establishment Clause challenges. *See, e.g.*, *Lee*, 505 U.S. at 597 ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one"). The opinions by Judges Stewart and Clement ignore this bedrock prudential rule.

Accordingly, we assume *arguendo* the Board is a *Marsh* "legislative" or "other deliberative public body". As another circuit explained, "*Marsh* does not permit legislators to ... engage, as part of public business and for the citizenry as a whole, in prayers that contain explicit references to a deity in whose divinity only those of one faith believe". *Wynne*, 376 F.3d at 301. In allowing such explicit references to "Jesus Christ", in selecting other persons to offer prayers who also referred exclusively to the Christian deity, and in demonstrating an unwillingness to adopt a policy that would have forbidden such references, the Board engaged in what *Marsh* forbids.[2]

---

[2] Judge Clement contends this analysis incorrectly allocates the burden of proof to the defendant Board, rather than the plaintiff Doe, because the Establishment Clause violation is based on an absence of evidence. *See infra.* But the unconstitutionality here is *not* found in a lack of evidence (*i.e.,* in the Board's failure to prove) that prayers from other faiths were offered; rather, the impermissible advancement of a particular religion is grounded in the Board's refusal to adopt a nonsectarian policy, the prayers' uniformly Christian tenor, and their overtly sectarian,

Although **Marsh** emphasized the longstanding tradition of legislative prayer, it also found "no indication" that the chaplain's nonsectarian prayers were "exploited to proselytize or advance any one" religion. 463 U.S. at 794-95. In contrast, it appears the sectarian prayers here *were* exploited in such a manner, both with their overtly Christian tone and no evidence that an adherent of any non-Christian faith was permitted to offer a prayer presenting a different message.[3] Other circuits have found prayers violative of **Marsh** even where some were offered by clerics of non-Christian faiths. *See, e.g.*, **Hinrichs**, 440 F.3d at 395.

---

proselytizing references. *See, e.g.*, **Hinrichs**, 440 F.3d at 395-96 (upholding Establishment Clause injunction when evidence showed 41 of the 53 legislative invocations during the calendar year were Christian, many containing identifiable supplications to Christ). It is the Board's *stipulated prayer practice*, not one particular prayer, that is at issue.

[3] Judge Clement maintains a content-based analysis contradicts **Marsh.** *See infra*. But **Marsh**'s guidance is not so simple. **Marsh**'s not examining content was conditioned on there being "no indication that the prayer opportunity has been exploited to proselytize or advance any one [faith or belief]", 463 U.S. at 794, a condition that often *requires* examination of content. *See, e.g., **Hinrichs**, 440 F.3d at 398-99 (rejecting the argument that **Marsh** proscribes examining sectarian prayer content, and "read[ing] **Marsh** as hinging on the nonsectarian nature of the invocations at issue"). **Marsh** noted the sectarian references were removed following filing of the complaint. 463 U.S. at 793, n.14. Unlike **Marsh**, the sectarian advances at issue here continue unabated, as reflected in the stipulations. This fact, combined with the apparent foreclosure of other religious viewpoints, demonstrates, as discussed *infra*, the prayer practice *was* exploited to *advance*, if not also proselytize, a particular faith.

The longstanding history of legislative prayer does not "justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief". *County of Allegheny*, 492 U.S. at 603. The prayers here have just that effect: an observer would perceive them to affiliate the Board, a political subdivision charged with acting in the public interest, with Christianity, and they show a clear preference for the Christian faith. This is impermissible under the Establishment Clause.

Unlike *Coles*, where at least *some* of the school board's prayers were "secular in their tenor", 171 F.3d at 373, none of the prayers included in the stipulations had such a tenor. Instead, each evoked a Christian tone, reflecting the Board's religious preference for Christianity. The Board claims *Coles* is distinguishable because that school board had a student member and thus student participation was not entirely voluntary. Without supporting evidence, the Board claims it does *not* have a student member.[4] Neither the Board's membership nor the statute establishing parish school boards reflect, however, that a student is not a member. *See* LA. REV. STAT. ANN. § 17:52(E)(1) (requiring, *inter alia*, that a school-board candidate have reached age 18). Even assuming the Board does *not* have a student member, and because

---

[4] Contrary to Judge Clement's opinion, because the Board, *not* Doe, makes this claim, the burden obviously rested on it to provide supporting evidence.

31

we rely solely on **Marsh**, while **Coles** applied **Lemon**, this is a distinction without a difference.

The most sectarian of the earlier-quoted prayers in the stipulations not only referred to "Jesus Christ" – which the Ninth Circuit deemed impermissible under **Marsh**, **Bacus**, 52 F. App'x at 356 – but also spoke of Jesus Christ as "the greatest gift of all – your darling son".  As the Ninth Circuit explained, "[s]ome religions accept Jesus Christ as the Messiah, some do not, and some people do not believe in any religious faith".  **Id.** at 357.  By solemnizing its prayers with any reference to Jesus Christ, the Board demonstrated its "allegiance to a particular sect or creed". **Id.** (quoting **County of Allegheny**, 492 U.S. at 603).  The Christian references, which went far beyond a permissible "ceremonial deism", were more overt and extensive than those found impermissible by the Sixth and Ninth Circuits.

As stated, no evidence exists that any prayers were given by non-Christians.[5]  Based on the four prayers in the stipulations, it is reasonable to infer none were.  Accordingly, by providing only Christians who presented Christian prayers, the Board at minimum "aggressively advocate[d]" Christianity. **Snyder**, 159 F.3d at 1234. We need not determine whether the prayers "proselytized" because it is enough that this prayer opportunity was "exploited to

---

[5] Again, in the light of the joint stipulations, the burden was on the Board to provide evidence of non-Christian prayers.  It failed to do so, as discussed *infra*.

32

proselytize *or* advance any one ... faith or belief". **Marsh**, 463 U.S. at 794-95 (emphasis added). The terms "proselytize" and "advance" are not synonymous. While "proselytize" "necessarily means to seek to 'convert' others to that belief", "'advance' ... means simply to 'forward, further, [or] promote' the belief". **Wynne**, 376 F.3d at 300 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 30, 1821 (3d ed. 1993)) (alteration in original). "Advancement *could* include 'conversion' but it does not necessarily contain any 'conversion' or 'proselytization' element." **Id.** (emphasis in original).

Because Board members selected those who offered prayers, they were able to – and did – select only those who would advance the Christian faith. The Board's prayers *did* "further" and "promote" their Christian beliefs, *see* **id.**, rather than attempting to "bind peoples of varying faiths". **Snyder**, 159 F.3d at 1234. The four prayers in the stipulations evidence "an [impermissible] intent to proselytize, or advance" Christianity. *See* **Murray**, 947 F.2d at 155. There is no evidence of any prayers that represented a different faith or were secular in tone.

Further, after this action was filed, the Board made no attempt to mitigate the effect the prayers had on those in attendance, or to make the prayers more inclusive of other religious beliefs. *See* **Wynne**, 376 F.3d at 295 (noting the town council refused suggested nonsectarian alternatives for its

33

invocations).  Along this line, and although this alone is not dispositive, the Board unanimously rejected a policy requiring "non-sectarian, non-proselytizing" invocations.  This was done shortly before the consent judgment concerning other prayer events in the School System.

"Whatever else the Establishment Clause may mean[,] ... it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)." *County of Allegheny*, 492 U.S. at 605.  Because the Board's prayers in the stipulations demonstrate a clear preference for Christianity, they are *not* permitted under **Marsh**.

In so holding, this opinion takes no position on whether *another* form of prayer is permissible at Board meetings.[6]  Instead, it holds only that prayers of the type included in the stipulations do *not* pass constitutional muster.  This holding is far more narrow than the relief granted by the permanent injunction at issue; it

---

[6] Contrary to Judge Clement's opinion at 4, this opinion does *not* "render[] all sectarian prayer necessarily unconstitutional". Nor, contrary to her claim at 5, does it "reduc[e] **Marsh** to a sectarian/non-sectarian litmus test".  Instead, being faithful to finding the most narrow basis for deciding the issue at hand, and based on the facts presented in the joint stipulations, this opinion holds that the prayers presented in those stipulations are unconstitutional.  In short, this holding is far more narrow than the broad reach erroneously ascribed to it by Judge Clement. Moreover, her opinion fails to recognize that, even if another type of prayer had been given, which the Board failed to show, that would *not* cure the unconstitutionality of the prayers in the *joint* stipulations.

34

enjoined *all* prayers at Board meetings.  For the issue at hand, the holding in this opinion — and the concomitant injunctive relief — need not be that expansive.

### III.

Pursuant to this opinion and those by Judges Stewart and Clement, the permanent injunction is **AFFIRMED in PART** and **VACATED in PART** and this matter is **REMANDED**  to district court for entry of an injunction consistent with this opinion.

*AFFIRMED in PART; VACATED in PART; REMANDED*

CARL E. STEWART, Circuit Judge, concurring in the judgment in part and dissenting in the judgment in part:

This case squarely presents the issue of the application of *Marsh v. Chambers*, 463 U.S. 783 (1983), to opening prayers by a school board.[1]  I am not convinced that *Marsh* applies to the situation before us; therefore, I believe the correct course is to affirm the district court's ruling, especially in light of the fact that the school board stipulated that its practice would fail under *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  My belief that *Marsh* is inapplicable to this situation is supported by the language of *Marsh*, subsequent Supreme Court precedent, and other Circuits' applications of *Marsh*.

I.

This case comes to this court on a record of stipulated facts. John Doe, on behalf of himself and as next friend of his minor children, John and Jack Doe, students at Loranger High School in Tangipahoa Parish, filed suit against the Tangipahoa Parish School Board in 2003, alleging various violations of the Establishment

---

[1]Contrary to Judge Barksdale's assertion that constitutional analysis requires that we avoid deciding this question, his assuming arguendo approach actually decides that *Marsh* applies because it is only the application of *Marsh* that would justify the vacatur of any part of the district court's injunction, especially considering the school board's concession that its entire practice would fail under *Lemon*.  Moreover, this case is unlike *Bacus v. Palo Verde Unified Sch. Dist. Bd of Ed.*, 52 F. App'x 355 (9th Cir. 2002), because the outcome of that case did not hinge on the application of *Marsh*; the outcome would have been the same under both *Marsh* and *Lemon*.  *Id.* at 356.

Clause. All but one of the alleged violations were resolved through a consent decree entered into by the parties on August 31, 2004. The issue that was not resolved, the opening of school board meetings with a prayer, proceeded to a bench trial before the district court judge on the stipulated facts.

The parties agree that the school board is a deliberative body responsible for the operation of the public schools within Tangipahoa Parish. The school board's meetings take place twice monthly in the boardroom of the Tangipahoa Parish School System's central office. The meetings are open to the public, and students may attend the meetings. The board meetings commence with an invocation, and board members, teachers, and students have delivered the prayer on various occasions over the last 30 years. The school board conceded that its practice would fail under the Supreme Court's four-part test in *Lemon v. Kurtzman*[2] but argued that *Marsh v. Chambers* was the correct test to apply to these facts.

The district court ruled that, because of the school board's "obvious connection to public education," 2005 WL 517341, *7 (E.D. La. 2005), and because of the refusal of most federal courts to extend *Marsh* beyond its specific facts, *id.* at *8, *Marsh* was

---

[2]The *Lemon* test requires that government action have a secular purpose, that its primary effect must be one that neither advances or inhibits religion, and that it not foster excessive government entanglement with religion in order to survive an Establishment Clause challenge. 403 U.S. at 613.

37

inapplicable to the case and the *Lemon* test should apply.  The district court then proceeded to analyze the constitutionality of the school board's prayer practice under *Lemon*, holding that the practice violated the Establishment Clause.

## II.

The facts of this case give rise to the thorny issue of *Marsh*'s place in the Supreme Court's Establishment Clause jurisprudence.  The only way to resolve this dispute is to squarely decide whether *Marsh* should be extended from its original context to this new set of circumstances.  After reviewing the parties' briefs and the stipulated record, I believe that *Marsh* does not apply to these facts in light of the constricted holding in *Marsh* itself and how other federal courts, including this one, have interpreted *Marsh*.  I would affirm the injunction of the district court based on the school board's admission that its practice fails under *Lemon*.

*Marsh* does not apply to prayer at school board meetings because of the narrowness of its holding.  The Court allowed the practice of legislative prayer to continue because it is "deeply embedded in the history and tradition of this country," *id.*, and, because days after approving a draft of the First Amendment, Congress voted to open legislative sessions with prayer, *id.* at 787.  Therefore, the Court reasoned, the practice does not present a "potential for establishment."  *Id.* at 791.

38

While *Marsh* mentions "other deliberative public bodies," 463 U.S. at 786, this phrase only appears once in an opinion that otherwise focuses entirely on the very specific factual history of legislative prayer.  This kind of history is not shared by the practice at issue here because the school board is not a legislative body.  From the board's admission that it directs the operation of the schools in its parish rather than passing laws, it seems obvious that the board's function is not legislative in nature.

The school board argues that it is a "deliberative public body" such that *Marsh* applies to its practice exactly as it would to a legislature's.  The Circuit courts that have considered this issue, however, have found that *Marsh*, despite its singular mention of non-legislative bodies, 463 U.S. at 786, is too narrow a holding to be interpreted so broadly.

The clearest example of a court being unwilling to use the solitary expression of the phrase "other deliberative public bodies" to extend the reasoning of *Marsh* is *ACLU v. Constangy*, 947 F.2d 1145 (4th Cir. 1991), *cert. denied*, 505 U.S. 1219 (1992).  Judge Constangy served on the North Carolina state bench and opened every judicial session with a prayer.  Despite his argument that his practice should be allowed because the judiciary is a "deliberative public bod[y]", the Fourth Circuit held that this language should not be interpreted without looking to the rest of

39

the *Marsh* opinion that very strongly focuses on the specific unique history of legislative prayer. *Id*. at 1148. The court specifically held that "the Supreme Court sees the holding of *Marsh* to be predicated on the particular historical circumstances presented in that case" and refused to extend *Marsh* past those circumstances. *Id*.

*Marsh* does not "create[] a presumption of validity for government-sponsored prayer at all deliberative public bodies." *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 380-81 (6th Cir. 1999). Instead, the furthest reach of *Marsh* has been local governing bodies that are legislative in nature. *See, e.g.*, *Simpson v. Chesterfield County*, 404 F.3d 276, 278, 280 (4th Cir.), *cert. denied*, 126 S. Ct. 426 (2005) (allowing a county board of supervisors who modeled its policy on the language of *Marsh* to open its meetings with a prayer); *Wynne v. Town of Great Falls,* 376 F.3d 292, 301-02 (4th Cir. 2004), *cert. denied*, 125 S. Ct. 2990 (2005) (striking down the sectarian prayers of a town council while noting that if the prayers had not been sectarian they would survive challenge under *Marsh*).

Beyond the fact that the school board is not a legislature, the application of *Marsh* should be limited by the special protections that the Court has mandated for any functions related to public education. In rejecting the mandatory observance of the

pledge of allegiance in public schools, the Court stated, "[t]hat [school boards] are educating the young for citizenship is reason for scrupulous protection of [c]onstitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943); *see also Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.").

The Sixth Circuit in *Coles* directly considered the application of *Marsh* to prayer by a school board. The court held that *Marsh* should not be applied to the practice because a school board is not equivalent to a legislature because of the school board's student "constituency." 171 F.3d at 381. The school board argues that *Coles* is irrelevant to this case because there is no evidence before the court that students are required to attend school board meetings, that the meetings take place on school property, or that students regularly attend the meetings voluntarily to discuss issues. While the *Coles* court did rely on these factors to some extent, the greater thrust of the holding is that "the function of a school board is uniquely directed toward school related matters . . . ." *Id.*

Even on the stipulated factual record before us here, it is clear that the existence of the school board is dependent on the existence of public schools. Supreme Court jurisprudence, as well as common sense, dictate that school board members should not be allowed to do at meetings what they could not mandate in the schools. *E.g.*, *Coles*, 171 F.3d at 382 ("Allowing the board to act in a manner inconsistent with its fundamental function of running the school system only leads to its further erosion in the minds of those students who either attend or hear about such meetings.").

Nor can the school board claim any protection of history for its practice. The Supreme Court has noted that not all practices that have a long history are protected by the kind of reasoning present in *Marsh*, *see County of Allegheny v. ACLU*, 492 U.S. 573, 603 (1989) ("*Marsh* plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today."), and the school board has only followed this practice for 30 years. Additionally, the Court has noted on several occasions that Establishment Clause challenges related to public education are rarely protected by history. *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) ("[A] historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted.") (internal citations omitted); *Wallace*

*v. Jaffree*, 472 U.S. 38, 80 (1985) (O'Connor, J., concurring) ("The simple truth is that free public education was virtually nonexistent in the late 18th century. Since there then existed few government-run schools, it is unlikely that the persons who drafted the First Amendment . . . anticipated the problems of interaction of church and state in the public schools.") (internal citations omitted).

The Court meant for *Marsh* to be a doctrinal enclave in its Establishment Clause analysis, narrowly ruling on the basis of both extensive, specific history and the nature of the legislative body at issue. I am not persuaded that we are on firm footing to extend this exceptional exception without further guidance from the Court. We should interpret *Marsh* according to the very narrow question that it claimed to decide: "whether the Nebraska Legislature's practice of opening each legislative day with a prayer by a chaplain paid by the State violates the Establishment Clause of the First Amendment." 463 U.S. at 784. The opening of a non-legislative public body with a prayer would extend the holding of *Marsh* beyond "the historical acceptance" of legislative prayer, *Edwards*, 482 U.S. at 583 n.4.

The Supreme Court has had multiple opportunities to extend its reasoning in *Marsh* to other situations and yet has chosen not to. In *McCreary County v. ACLU*, 125 S. Ct. 2722 (2005), the Court noted that, unless special factors such as those that existed in *Marsh*

counsel otherwise, government affiliation with religion is not constitutional. *Id.* at 2733 n.10. These cases and the language in *Marsh* itself lead to the conclusion that the holding in *Marsh* was meant to be a very limited exception from more commonly accepted Establishment Clause doctrine predicated on the "unique history," 463 U.S. at 791, of the practice at issue in *Marsh*.

Even this rationale has been limited by the Court in subsequent cases. In *County of Allegheny*, the Court addressed the appropriateness of a creche display in front of a government building. The Court noted that the historic pedigree of government recognition of religious holidays could not save the display of the creche if it otherwise violated the Establishment Clause. 492 U.S. 573, 603. Although the dissenting Justices would have held that the display was constitutional because it did not proselytize, the Court rejected this approach, holding that, except in the limited factual circumstances of *Marsh*, proselytization is not necessary to show that the government has preferred one religion over another, or even religion over non-religion. *Id*. at 602-05. The *Marsh* opinion's singular mention of "other deliberative public bodies," without more, is not enough to overcome the Supreme Court's own reluctance in subsequent cases to extend *Marsh*'s reasoning to different factual scenarios.

Even in cases where the Supreme Court has arguably relied on *Marsh* to approve of government action that would seemingly

44

otherwise be in violation of the Establishment Clause, the Court has carefully narrowed the holding of *Marsh* to the unique history of legislative prayer. In *Van Orden v. Perry*, 125 S. Ct. 2854 (2005), the Court approvingly quoted *Marsh* to emphasize that not all government affiliation with religion violates the Establishment Clause but still noted that *Marsh* relied on the unique factual circumstances of legislative prayer, dating back to the drafters of the Constitution. *Id.* at 2862. In *Lynch v. Donnelly*, 465 U.S. 668 (1984), in which the Court upheld the inclusion of a creche in a multi-denominational holiday display, *Marsh* was quoted approvingly multiple times; however, the Court also undertook a historical analysis of national recognition of holiday celebrations. *Id*. at 674-78.

Finally, in *Lee v. Weisman*, 505 U.S. 577 (1992), the Court compared the legislative prayer at issue in *Marsh* to a school-sponsored prayer at a high school graduation. Although the opinion in *Lee* did not explicitly focus on the history of the legislative prayer practice, the Court carefully limited its discussion to a comparison of the graduation prayer to a prayer in a state legislative chamber, *id.* at 596-97, and refused to extend *Marsh* to that prayer, *id.* at 596. Even cases in which the Supreme Court has relied on *Marsh*, there is no support for the extension of *Marsh* that the Tangipahoa School Board seeks in this case.

45

What the Tangipahoa School Board asks this court to do is extend the holding of *Marsh* to a new set of factual circumstances that are completely distinct from the legislative arena, something none of our prior cases have done. In *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991), this court considered whether federal laws that prohibited the use of peyote generally but allowed its use by Native American tribes violated the Establishment Clause. In determining that the special relationship between the federal government and Native American tribes is not susceptible to the usual Establishment Clause analysis, this court cited *Marsh* as an example of the flexible approach the Supreme Court has taken when specific factors, such as "unambiguous and unbroken history of more than 200 years," are present. 922 F.2d at 1216 (citing *Marsh*, 463 U.S. at 792). There is no special relationship or unique history in this case that warrants ignoring the Supreme Court's general instruction that the *Lemon* test applies to Establishment Clause challenges.

We also considered *Marsh* in *Murray v. City of Austin*, a case involving whether a religious symbol in a city insignia violates the Establishment Clause. Although the decision in *Murray* discusses *Marsh* in terms that appear to go beyond its historical meaning, 947 F.2d 147, 155 (5th Cir. 1991) ("[W]e lack the kind of evidence of original intent present in *Marsh* . . . [y]et this case does share some important similarities with *Marsh* . . . ."), *cert.*

46

*denied*, 505 U.S. 1219 (1992), the case ultimately rests on *County of Allegheny*'s language about government endorsement of religion. *Id.* at 156. *Murray* does not stand for the proposition that *Marsh* can be applied in the absence of the unique history of the practice at issue in that case.

Other Circuits that have considered the application of *Marsh* also have narrowly construed the decision to address only those circumstances that would warrant a direct application of *Marsh*. The Fourth Circuit first addressed the issue in *Constangy*, finding that without evidence of long-standing tradition and the "intent of the framers of the Bill of Rights with regard to the [practice]," 947 F.2d at 1148, *Marsh* should not be applied. The court reaffirmed their reliance on the historical circumstances of *Marsh* in *Mellen v. Bunting*, 327 F.3d 355 (4th Cir. 2003), *cert. denied*, 541 U.S. 1019 (2004), when the court refused to apply *Marsh* to exempt the evening prayer at the Virginia Military Institute from the *Lemon* test. *Id.* at 370.

Subsequent Fourth Circuit cases have applied *Marsh* but have not extended it. When considering whether the daily, voluntary recitation of the pledge in public schools violates the Establishment Clause, the court relied on *Marsh* not for its specific holding but for its reliance on history. *Myers v. Loudoun County Public Schools*, 418 F.3d 395, 403-04 (4th Cir. 2005). The Fourth Circuit struck down prayer by a legislative body, a town

council, in *Wynne* because it was sectarian, 376 F.3d 292, 301-02, although the prayers otherwise would have fit within *Marsh*'s framework of legislative prayer, including the historical circumstances of legislative prayer. *Id.* at 302. Similarly, the practice of a county board of supervisors to open its meetings with a prayer was found not to violate *Marsh* because a board of supervisors is a legislative body similar to the kind that was specifically at issue in *Marsh* and because its prayer policies specifically tracked the language the Court used in *Marsh*. *Simpson v. Chesterfield County*, 404 F.3d 276, 278, 280. In short, all the cases of the Fourth Circuit support a narrow reading of *Marsh*, limited to the practice of legislative prayer that was at issue in the case.

Almost every other Circuit that has considered the application of *Marsh* to diverse facts has relied on the historical analysis in *Marsh* to limit its holding to only its specific factual context. *See, e.g.*, *Hinrichs v. Bosma*, 440 F.3d 393, 398 (7th Cir. 2006) (striking down sectarian legislative prayer while noting that the practice of legislative prayer is "analyzed . . . largely based on considerations of history and tradition"); *Glassroth v. Moore*, 335 F.3d 1282, 1298 (11th Cir.) (holding that the placement of a Ten Commandments monument in a courthouse should not be judged by *Marsh* because the practice does not have the "unambiguous and unbroken history" of legislative prayer), *cert. denied*, 540 U.S. 1000

(2003); *ACLU v. Capitol Square Review and Advisory Bd.*, 243 F.3d 289, 300 (6th Cir. 2001) (holding that the state motto of Ohio, "With God, All Things Are Possible," does not violate the Establishment Clause after undertaking an extensive historical review of ceremonial deism based in part on *Marsh*'s historical analysis); *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 381 (6th Cir. 1999) (viewing *Marsh* as "one-of-a-kind"); *Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1076 (2d Cir. 1997) (refusing to apply *Marsh* because it "relied heavily on the long tradition of public prayer in [the legislative] context") (citations omitted), *cert. denied*, 528 U.S. 1003 (1999); *Cammack v. Waihee*, 932 F.2d 765, 772 (9th Cir. 1991) (refusing to apply *Marsh* to Hawaii's Good Friday holiday because *Marsh* was "explicitly based upon the 'unique history' surrounding legislative prayer") (citations omitted), *cert. denied*, 505 U.S. 1219 (1992); *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 828 (11th Cir.) (holding that "[b]ecause *Marsh* was based on more than 200 years of the 'unique history' of legislative invocations, it has no application to the case at bar") (citations omitted), *cert. denied*, 490 U.S. 1090 (1989). *But see Van Zandt v. Thompson*, 839 F.2d 1215, 1219 (7th Cir. 1988) ("The district court viewed *Marsh* as . . . a one-time departure from the Court's consistent application of the *Lemon* criteria to establishment clause cases. . . . In our opinion this is much too crabbed a view."). Finally, in a concurrence, Judge Lucero's

analysis in *Snyder v. Murray City Corp.*, which would apply *Marsh* only to legislative prayer by established chaplaincies, demonstrates another viewpoint about the extreme narrowness of the holding in *Marsh*. 159 F.3d 1227, 1237 (10th Cir. 1998) (Lucero, J., concurring), *cert. denied*, 526 U.S. 1039 (1999).

Based on my view of the narrowness of the exception in *Marsh*, I must dissent from its application to any part of the practice of the Tangipahoa School Board of opening its meetings with a prayer. The school board is not a legislative body within the purview of *Marsh* , nor does its practice share the "unique" history of legislative prayer.

### III.

The Supreme Court has made clear that *Marsh*'s application depends on a showing that the practice at issue is legislative prayer with its unique history. The *Lemon* test should apply to the practice of the Tangipahoa Parish School Board because the Supreme Court has announced no applicable exception to its normal Establishment Clause jurisprudence that would allow this court to deviate from *Lemon*. In light of the school board's admission that its practices fail the *Lemon* test, I would affirm the district court's order. I dissent from any application of *Marsh* vacating the district court's order, and I concur in the judgment only to the extent that it upholds the injunction.

50

EDITH BROWN CLEMENT, Circuit Judge, concurring in the judgment in part and dissenting in the judgment in part:

I would hold that *Marsh v. Chambers*, 463 U.S. 783 (1983), rather than *Lemon v. Kurtzman*, 403 U.S. 602 (1971), applies to this deliberative body. I disagree with the conclusion that the four stipulated prayers violate *Marsh*. As to the question of how to apply *Marsh*, I read *Marsh* as prohibiting exploitation of prayer opportunities to advance one religion over another. Therefore, the injunction should be vacated in full because Doe failed to demonstrate that the Board exploited the prayer opportunity either "to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794–95. The conclusion in Judge Barksdale's opinion that the Board demonstrated a clear preference for Christianity suffers from a lack of evidence in the record and an erroneously shifted burden of proof that requires the Board to prove it did *not* violate *Marsh*. Furthermore, even under the reasoning in Judge Barksdale's opinion, the fourth prayer in the stipulations, given June 15, 2004, survives scrutiny under *Marsh*.

## A. *Marsh* permits sectarian prayer when the prayer opportunity is not exploited for impermissible purposes

I believe that Judge Barksdale's opinion misreads *Marsh* as allowing only non-sectarian prayer. This view would deem all explicit references to sectarian deities necessarily unconstitutional without regard to the government body's practices

52

or motivations. Such a holding does not square with *Marsh*. The *Marsh* Court's focus was—as ours should be—not on the content of the prayer but on the practices and motivations behind the prayer opportunity. Under *Marsh*, a plaintiff must first show that a prayer opportunity was exploited for an impermissible purpose before the prayer's content becomes relevant. *Marsh*, 463 U.S. at 794-95. The Supreme Court has recently reaffirmed this premise. "[The] Establishment Clause doctrine lacks the comfort of *categorical absolutes*. In special instances we have found good reason to hold governmental action legitimate even where its manifest purpose was presumably religious." *McCreary County v. Am. Civil Liberties Union of Ky.*, 125 S. Ct. 2722, 2733 n.10 (2005) (emphasis added). The *McCreary County* Court cited *Marsh* as one such example of the Court "upholding legislative prayer despite its religious nature." *Id.* A content-based rule is troubling for several reasons.

**(1) A content-based rule contradicts *Marsh***

The precedent on which Judge Barksdale's opinion chiefly relies disavows leading with the content-based analysis employed in his opinion. In *Marsh*, the Court described the prayer as being "in the Judeo-Christian tradition." 463 U.S. at 793. The only reference in the *Marsh* majority opinion to any sectarian/non-sectarian distinction came in a footnote, when the Court observed that the chaplain who gave the prayers described them as being

53

"'nonsectarian,' 'Judeo Christian,' and with 'elements of the American civil religion.'" *Id*. at 793 n.14. The Court expressly avoided ruling based on the content of the prayer:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id*. at 794–95. The *Marsh* Court's instruction not to reject prayer based on content alone is clear—unless the prayer opportunity has been shown to be exploitive, the content of the prayer is irrelevant. Judge Barksdale's opinion contradicts *Marsh*'s instruction by first focusing on the content of the prayers rather than the Board's use of the prayer opportunity.

If content is determinative, the *Marsh* Court's analysis would be internally conflicted. The content of congressional prayer, referred to by the *Marsh* Court as exemplifying permissible legislative prayer, traditionally has included sectarian references. In addition, Congress continues to permit sectarian invocations, as it has since the practice's inception.[3] This

---

[3]There is no doubt that prayers before Congress often contain explicit sectarian references. *See Newdow v. Bush*, 355 F. Supp. 2d 265, 285 n.23 (D.D.C. 2005) (noting that "the legislative prayers at the U.S. Congress are overtly sectarian"); *see also* Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 COLUM. L. REV. 2083, 2104 & n.118 (1996) (noting that, in the six-year period before 1996, "over two hundred and fifty opening prayers delivered by congressional chaplains have included

54

practice, which Judge Barksdale's opinion would deem unconstitutional under *Marsh*, has been upheld by the D.C. Circuit. *See Murray v. Buchanan*, 720 F.2d 689, 690 (D.C. Cir. 1983) (en banc) (per curiam); *see also Newdow v. Eagen*, 309 F. Supp. 2d 29, 41 (D.D.C. 2004) (holding that congressional prayer remains constitutional under *Marsh*).

By relying on congressional prayer as a demonstrative example, the *Marsh* Court endorsed the understanding that the sectarian nature of the prayer's content does not render it necessarily constitutionally unsound. *Marsh*, 463 U.S. at 794–95; *see also McCreary County*, 125 S. Ct. at 2733 n.10 (citing *Marsh* as an example of a permissible prayer whose "manifest purpose was presumably religious"). Indeed, the Court stated that the Founders "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view." *Marsh*, 463 U.S. at 792 (internal quotation omitted). The content of the prayers identified in the stipulations does not vary meaningfully from that of the prayers offered in Congress on a day-to-day basis. Furthermore, two federal district courts have recently affirmed the principle that a prayer's sectarian nature does not make it impermissible. *Pelphray v. Cobb County*, 410 F. Supp. 2d 1324, 1325, 1349 (N.D. Ga. 2006)

---

supplications to Jesus Christ").

(refusing to enjoin sectarian prayers at government meetings "that refer to 'Jesus,' 'Jesus Christ,' or 'Christ'"); *Dobrich v. Walls*, 380 F. Supp. 2d 366, 371, 377 (D. Del. 2005) (permitting sectarian prayers at school board meetings, including the expression "in the name of Christ").

**(2) *Marsh* instead focuses on the exploitation of the prayer opportunity**

Where invocations are intended to promote non-sectarian calls for guidance, wisdom, and solemnity, the First Amendment clearly is not violated. *See Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 282 (4th Cir. 2005) ("The Court also recognized that legislative invocations comport with the Establishment Clause not only because that tradition is ancient, but because invocations are intended to harmonize broadly 'with the tenets of some or all religions.'") (quoting *Marsh*, 463 U.S. at 792); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) (en banc) ("That genre, although often taking the form of invocations that reflect a Judeo-Christian ethic, typically involves nonsectarian requests for wisdom and solemnity, as well as calls for divine blessing on the work of the legislative body."). This safe-harbor rule *permitting* non-sectarian prayer, however, does not *compel* a rule—imposed by Judge Barksdale's opinion—rendering all sectarian prayer necessarily unconstitutional. As the Tenth Circuit pointed out in *Snyder*, the

Establishment Clause does not prohibit all prayer that can be identified with a particular sect; "[r]ather, what is prohibited by the clause is a more aggressive form of advancement, i.e., proselytization." 159 F.3d at 1234 n.10 (citing *Marsh*, 463 U.S. at 793 n.14, 794–95). Because all prayer is, at least in some way, inclusive to some and exclusive to others, "the kind of legislative prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that aggressively advocates a specific religious creed, or that derogates another religious faith or doctrine." *Id*. at 1234. The *Snyder* court also noted that "[b]y using the term 'proselytize,' the Court indicated that the real danger in this area is effort by the government to convert citizens to particular sectarian views." *Id.* at 1234 n.10. By reducing *Marsh* to a sectarian/non-sectarian litmus test, Judge Barksdale's opinion overlooks the pivotal focus of the *Marsh* decision—whether the prayer opportunity was exploited for constitutionally impermissible purposes—and contravenes the Court's admonition against ruling based on content alone. *See Marsh*, 463 U.S. at 794–95; *see also Snyder*, 159 F.3d at 1234 n.10 (noting that "all prayers 'advance' a particular faith or belief in one way or another" and reading *Marsh* as "underscor[ing] the conclusion that the mere fact a prayer evokes a particular concept of God is not enough to run afoul of the Establishment Clause").

57

In addition, as the Court forewarned, a content-based approach is bad policy:  by placing the evaluation of the prayers' content ahead of the evaluation of the use of the prayer opportunity, this approach needlessly puts federal courts in the position of drawing the constitutional (and theological) line between sectarian and non-sectarian prayer.  *Marsh*, 463 U.S. at 795 ("[I]t is not for us to embark on a sensitive evaluation or to parse the *content* of a particular prayer.") (emphasis added).  Such attempts require courts to interpret tenets of different faiths and to make controversial judgments about what aspects of those faiths are most important to their adherents.  *Lee v. Weisman*, 505 U.S. 577, 616–17 (1992) (Souter, J., concurring) ("I can hardly imagine a subject less amenable to the competence of the federal judiciary, or more deliberately to be avoided where possible" than "comparative theology.").  To make such judgments, courts must determine both the doctrinal meaning of a prayer (which requires the court to ascertain the prayer leader's belief) and whether that meaning differs significantly from the religious beliefs of others (which, again, requires ascertaining their beliefs).  Drawing such theological distinctions, which only invite a new wave of litigation, is beyond the expertise, or proper role, of federal courts.

**B.    *Marsh* applied to this record**

58

In addition to many generalist religious references, the illustrative set of prayers from the stipulations include references to "Jesus Christ," "Jesus Christ our Lord," and "Your Son, Jesus Christ." In Doe's view, "that these prayers advance Christianity is undeniable." Doe further contends that the prayers "clearly discriminate against non-Christians." In support of the argument that the Board's invocations improperly advance Christianity, Doe cites *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter* for the proposition that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." 492 U.S. 573, 605 (1989) (internal quotation omitted). The Establishment Clause does not, however, demand that governments abandon religion in favor of secularism: "To the extent that the Establishment Clause prevents preferences for one religion over another, it likewise prevents preferences for religion over nonreligion." *Murray v. City of Austin*, 947 F.2d 147, 155 (5th Cir. 1991); *see also County of Allegheny*, 492 U.S. at 605 (noting that there exists "no official preference even for religion over nonreligion").

Judge Barksdale's opinion accepts Doe's argument, stating that "[e]ach prayer in the stipulations is Christian in tenor, if not in fact." Furthermore, it states that "none of the prayers included in the stipulations had such a [secular] tenor. Instead, each

59

evoked a Christian tone, reflecting the Board's religious preference for Christianity."

As is normally the case, the plaintiff bringing an Establishment Clause claim under § 1983 bears the burden of proof. *See Gillette v. United States*, 401 U.S. 437, 450–51 (1971) (rejecting a challenge under the Establishment Clause); *Bowden v. City of Electra*, 152 F. App'x 363, 367 (5th Cir. 2005) (noting, in another constitutional context, that "a plaintiff in a suit filed under 42 U.S.C. § 1983 has the burden of proving each element of the constitutional violation"); *Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 300 (5th Cir. 1999) (Garza, J., dissenting) ("[T]he plaintiffs bear the burden of proof on . . . their Establishment Clause claim."), *reh'g en banc*, 240 F.3d 462 (5th Cir. 2001). On more than one occasion, however, Judge Barksdale's opinion faults the Board for *not* proving a particular point. The stipulations do not contain evidence establishing viewpoint discrimination or hostility to non-Christian religions. In the absence of proof to the contrary, the Board's actions have not been shown to be impermissible under the Constitution. The conclusions in Judge Barksdale's opinion, based upon an absence of evidence, cannot be squared with the allocation of the burden of proof on Doe.

Doe has made no showing that he or anyone was ever denied the opportunity to have an invocation led by someone of a more personally acceptable denomination (or non-denomination). Rather,

60

the record, as limited as it is, reflects that the Board has affirmatively stated, through the stipulated and offered testimony, its willingness to allow any viewpoint to be heard at the meetings. Doe's bare argument, unsupported by the stipulated evidence, that the Board is not true to its word cannot carry his burden. Even if Doe's claim—that historically, the Board's prayers have been uniformly Christian—is true, there is simply no record evidence that the Board *advances* Christianity to the *exclusion* of another sect or creed.

Judge Barksdale's opinion, however, when analyzing the stipulated prayers under *Marsh*, states, "it appears the sectarian prayers here *were* exploited [to advance Christianity] with their overtly Christian tone and no evidence [was produced] that an adherent of any non-Christian faith was permitted to offer a prayer presenting a different message." This determination is based on an *absence* of evidence. The similar conclusion that "the Board at [a] minimum aggressively advocate[d] Christianity" is based on an inference, which, in turn, is also drawn from a lack of evidence. The foundation for the holding that the Board improperly advanced Christianity is the understanding that the Board "provid[ed] only Christians who presented Christian prayers." That understanding is nothing more than an inference "[b]ased on the four prayers in the stipulations" and the fact that "no evidence exists that any prayers were given by non-Christians." The record is devoid of any

61

evidence showing that anyone from any other sect or creed ever asked to participate in the Board's invocations.[4]

Even if the contention in Judge Barksdale's opinion that "[t]here is no evidence of any prayers that represented a different faith" were a correct application of the burden of proof, there is, likewise, no evidence that any non-Christians were ever *denied* an opportunity to offer a prayer or in any way were hampered in participating in whatever form they wished. After the Board asserted that it has never excluded any faith or denomination from participating in the invocations, Doe identified nothing in the record to counter this assertion.

Regardless, there is evidence in support of a *non-exclusive* policy. In the stipulated facts, the named defendants, including the members of the Board, stated a willingness to "testify under oath that the Tangipahoa School Board does not discriminate on the basis of religious viewpoint and that any individual who wants to give the invocation prior to a board meeting can do so regardless of their religious beliefs." Again, Doe offers no evidence to counter the proposed testimony.

---

[4]Judge Barksdale's opinion similarly faults the Board for not proving that a student is not a member. While the presence or absence of a student member on the school board is not determinative because Judge Barksdale's opinion assumes that *Marsh* applies, the absence of proof regarding the Board's assumed-but-not-proven exclusionary policy is critical.

I also disagree with the attempt in Judge Barksdale's opinion to prove exploitation of the prayer opportunity by reference to the Board's unadopted policy. Judge Barksdale's opinion infers hostility to non-sectarian, non-proselytizing prayer from the Board's rejection of the written policy. Moreover, based solely on the Board's rejection of the policy, Judge Barksdale's opinion surmises that "the Board made no attempt to mitigate the effect the prayers had on those in attendance, or to make the prayers more inclusive of other religious beliefs."

We should not overlook the possibility of alternative reasons for rejecting the policy. The policy limited the pool of potential leaders of the invocation in conflict with the Board's past practice. That change could have been the reason for rejecting the proposed policy. Indeed, the rejection of the policy could have stemmed from the Board's concern that it was not constitutionally permitted to limit the viewpoint of potential speakers. Whatever the reason, without more evidence in the record, the Board's rejection of the written policy does not prove that the Board exploited the prayer opportunity to advance Christianity to the exclusion of other faiths.

## C. The June 15 prayer survives even the reading of *Marsh* employed in Judge Barksdale's opinion

Even under the reading of *Marsh* applied in Judge Barksdale's opinion, the prayer given June 15, 2004, is not unconstitutional. The prayer contains no sectarian invocations. Rather, the generic

63

references to "Father," "God," and "Lord" indisputably pass the perceived non-sectarian requirement. By grouping this last prayer in with the first three, Judge Barksdale's opinion obfuscates the important distinction it seems to be trying to draw. Unlike the Christian references found in the other stipulated prayers, such as "Jesus Christ," "Jesus Christ our Lord," and "Your Son, Jesus Christ," the June 15 prayer displays no Christian tenor.

Judge Barksdale's opinion cites *Hinrichs v. Bosma*, 440 F.3d 393 (7th Cir. 2006), for the proposition that *Marsh* permits only non-sectarian prayer. Both sides of the *Hinrichs* debate, however, would allow the June 15 prayer to survive constitutional scrutiny; the injunction in place in *Hinrichs* certainly would permit the June 15 prayer. *See Hinrichs*, 440 F.3d at 402 ("The injunction permits prayer so long as it is of a nondenominational nature and does not 'use Christ's name or title or any other denominational appeal.'") (quoting *Hinrichs v. Bosma*, 410 F. Supp. 2d 745, 748 (S.D. Ind. 2006) (denying a stay of an injunction on sectarian prayer)). In rejecting the June 15 prayer, Judge Barksdale's opinion strays from its own reasoning.

**D.   Conclusion**

I would apply *Marsh* to this deliberative body. In my view, Judge Barksdale's opinion misreads *Marsh* and improperly shifts the burden onto the Board to prove it did not violate *Marsh*. On this record, I cannot conclude that Doe has proven that the Board

violated *Marsh*.  As such, I would vacate the district court's injunction in full.