# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 15, 2009        Decided May 7, 2010

No. 09-5126

MICHAEL ARTHUR NEWDOW, ET AL.,
APPELLANTS

v.

JOHN G. ROBERTS, JR., CHIEF JUSTICE OF THE U.S. SUPREME
COURT, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-02248-RBW)

*Michael Newdow* argued the cause for appellants.
With him on the briefs was *Robert V. Ritter*.

*Lowell V. Sturgill Jr.*, Attorney, U.S. Department of
Justice, argued the cause for appellees John G. Roberts, Jr., et
al. With him on the brief was *Mark B. Stern*, Attorney. *Brad
P. Rosenberg*, Attorney, entered an appearance.

*Dominic F. Perella* argued the cause for appellees
Presidential Inaugural Committee and Emmett Beliveau.
With him on the brief were *Craig A. Hoover*, *Catherine E.*

*Stetson*, *E. Desmond Hogan*, *Robert Bauer*, and *Andrew Werbrock*. *Marc Elias* entered an appearance.

*H. Robert Showers* and *Kevin T. Snider* were on the brief for appellees Joseph Lowery and Richard Warren.

*James Matthew Henderson, Sr.* was on the brief for *amicus curiae* American Center for Law & Justice in support of appellees.

*Greg Abbott*, Attorney General, *James C. Ho*, Solicitor General, *C. Andrew Weber*, First Assistant Attorney General, *Adam W. Aston*, Assistant Solicitor General, *David S. Morales*, Deputy Attorney General for Civil Litigation, *Candice N. Hance*, Assistant Attorney General, Attorney General's Office of the State of Texas, *Troy King*, Attorney General, Attorney General's Office of the State of Alabama, *Daniel S. Sullivan*, Attorney General, Attorney General's Office of the State of Alaska, *Terry Goddard*, Attorney General, Attorney General's Office of the State of Arizona, *Dustin McDaniel*, Attorney General, Attorney General's Office of the State of Arkansas, *Edmund G. Brown, Jr.*, Attorney General, Attorney General's Office of the State of California, *John W. Suthers*, Attorney General, Attorney General's Office of the State of Colorado, *Richard Blumenthal*, Attorney General, Attorney General's Office of the State of Connecticut, *Joseph R. Biden, III*, Attorney General, Attorney General's Office of the State of Delaware, *Bill McCollum*, Attorney General, Attorney General's Office of the State of Florida, *Thurbert E. Baker*, Attorney General, Attorney General's Office of the State of Georgia, *Mark J. Bennett*, Attorney General, Attorney General's Office of the State of Hawaii, *Lawrence G. Wasden*, Attorney General, Attorney General's Office of the State of Idaho, *Lisa Madigan*, Attorney General, Attorney General's Office of the State of Illinois, *Gregory F. Zoeller*, Attorney General, Attorney General's Office of the State of Indiana,

*Tom Miller*, Attorney General, Attorney General's Office of the State of Iowa, *Steve Six*, Attorney General, Attorney General's Office of the State of Kansas, *Jack Conway*, Attorney General, Attorney General's Office of the Commonwealth of Kentucky, *James D. "Buddy" Caldwell*, Attorney General, Attorney General's Office of the State of Louisiana, *Janet T. Mills*, Attorney General, Attorney General's Office of the State of Maine, *Douglas F. Gansler*, Attorney General, Attorney General's Office of the State of Maryland, *Martha Coakley*, Attorney General, Attorney General's Office of the Commonwealth of Massachusetts, *Michael A. Cox*, Attorney General, Attorney General's Office of the State of Michigan, *Lori Swanson*, Attorney General, Attorney General's Office of the State of Minnesota, *Jim Hood*, Attorney General, Attorney General's Office of the State of Mississippi, *Chris Koster*, Attorney General, Attorney General's Office of the State of Missouri, *Steve Bullock*, Attorney General, Attorney General's Office of the State of Montana, *Jon C. Bruning*, Attorney General, Attorney General's Office of the State of Nebraska, *Catherine Cortez Masto*, Attorney General, Attorney General's Office of the State of Nevada, *Michael A. Delaney*, Attorney General, Attorney General's Office of the State of New Hampshire, *Anne Milgram*, Attorney General, Attorney General's Office of the State of New Jersey, *Gary K. King*, Attorney General, Attorney General's Office of the State of New Mexico, *Andrew M. Cuomo*, Attorney General, Attorney General's Office of the State of New York, *Roy Cooper*, Attorney General, Attorney General's Office of the State of North Carolina, *Wayne Stenehjem*, Attorney General, Attorney General's Office of the State of North Dakota, *Richard Cordray*, Attorney General, Attorney General's Office of the State of Ohio, *W. A. Drew Edmondson*, Attorney General, Attorney General's Office of the State of Oklahoma, *John R. Kroger*, Attorney General, Attorney General's Office of the State of Oregon, *Thomas W. Corbett, Jr.*, Attorney General,

Attorney General's Office of the Commonwealth of Pennsylvania, *Patrick C. Lynch*, Attorney General, Attorney General's Office of the State of Rhode Island, *Henry D. McMaster*, Attorney General, Attorney General's Office of the State of South Carolina, *Marty J. Jackley*, Attorney General, Attorney General's Office of the State of South Dakota, *Robert E. Cooper, Jr.*, Attorney General, Attorney General's Office of the State of Tennessee, *Mark Shurtleff*, Attorney General, Attorney General's Office of the State of Utah, *William H. Sorrell*, Attorney General, Attorney General's Office of the State of Vermont, *Bill Mims*, Attorney General, Attorney General's Office of the Commonwealth of Virginia, *Robert M. McKenna*, Attorney General, Attorney General's Office of the State of Washington, *Darrell V. McGraw*, *Jr.*, Attorney General, Attorney General's Office of the State of West Virginia, *J. B. Van Hollen*, Attorney General, Attorney General's Office of the State of Wisconsin, *Bruce Salzburg*, Attorney General, Attorney General's Office of the State of Wyoming, and *Vincent F. Frazer*, Attorney General, Attorney General's Office of the U.S. Virgin Islands, were on the brief of *amici curiae* States of Texas, et al. in support of appellees.

Before: GINSBURG, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion concurring in the judgment filed by *Circuit Judge* KAVANAUGH.

BROWN, *Circuit Judge*:    Plaintiffs appeal the dismissal of their constitutional challenge to religious elements of the presidential inaugural ceremony. We affirm the dismissal because plaintiffs' claims regarding the 2009 inaugural ceremony are moot and plaintiffs lack standing to challenge the 2013 and 2017 inaugurations.

I

Barack Obama was elected President of the United States on November 4, 2008. Prior to and following his election, organizations were formed to assist preparations for the January 20, 2009 ceremony that would mark his inauguration. The then President-elect created a private coordinating group, the Presidential Inaugural Committee ("PIC"), recognized by statute as "the committee appointed by the President-elect to be in charge of the Presidential inaugural ceremony and functions and activities connected with the ceremony." 36 U.S.C. § 501(1). By concurrent resolution, Congress established the Joint Congressional Committee on Inaugural Ceremonies ("JCCIC") and authorized it to "utilize appropriate equipment and the services of appropriate personnel of departments and agencies of the Federal Government" to "make the necessary arrangements for the inauguration of the President-elect." S. Con. Res. 67, 110th Cong. (2008). The U.S. military services, pursuant to 10 U.S.C. § 2553, jointly formed the Armed Forces Inaugural Committee ("AFIC") to assist the JCCIC and the PIC in "[p]lanning and carrying out" security and safety measures, ceremonial duties, and other appropriate activities for the inauguration. *Id.* § 2553(b).

Through the PIC, President Obama invited two private ministers—Revs. Rick Warren and Joseph Lowery—to lead invocation and benediction prayers, respectively, at the inaugural ceremony. President Obama also communicated his wish to John Roberts, Jr., Chief Justice of the United States,[1] that the Chief Justice administer the presidential oath of office at the ceremony and append the phrase "So help me God" to conclude the oath. *See* Declaration of Jeffrey P.

---

[1] Both parties and the case heading refer to Chief Justice Roberts as "the Chief Justice of the United States Supreme Court." If one is to be completely exact, however, the official title is simply "Chief Justice of the United States." 28 U.S.C. § 1.

Minear, Counselor to the Chief Justice, *Newdow v. Roberts*, Civil Action No. 08-2248 (D.D.C. Jan. 8, 2009), App. for Appellants at 42.

While these preparations were ongoing, plaintiffs were also preparing themselves to attend or view President Obama's inauguration. Plaintiffs—who individually describe themselves as atheist, *see, e.g.*, App. for Appellants at 125, nonreligious and nontheistic, *see, e.g.*, *id.* at 126, Secularist, *see, e.g.*, *id.* at 128, or humanist, *see, e.g.*, *id.* at 136—were hoping President Obama would eschew the prayers and the "So help me God" phrase that have become traditional elements of the inaugural ceremony. However, upon learning these elements were scheduled to be part of the ceremony, plaintiffs sought declaratory and injunctive relief in the district court that would bar those elements for the 2009 as well as for future inaugurations as violations of the First and Fifth Amendments, and in particular the Establishment Clause of the First Amendment. *See* Complaint at 1, *Newdow*, Civil Action No. 08-02248 (D.D.C. Dec. 29, 2008). The complaint represented the third Establishment Clause lawsuit the lead plaintiff, Michael Newdow, has brought before federal courts against religious elements of presidential inaugural ceremonies. [2] Plaintiffs also moved for a preliminary injunction six days after filing their initial complaint.

The district court, after a hearing, denied plaintiffs' preliminary injunction motion and ordered them to show cause

---

[2] Newdow's first suit challenged President George W. Bush's sanctioning of a Christian prayer as part of the 2001 inaugural ceremony. The Ninth Circuit ultimately dismissed that suit for lack of standing "because [Newdow] d[id] not allege a sufficiently concrete and specific injury." *Newdow v. Bush*, 89 F. App. 624, 625 (9th Cir. 2004). Newdow's second suit, challenging President Bush's second inaugural ceremony, was also dismissed for lack of standing, because the doctrine of issue preclusion prevented Newdow from relitigating the Ninth Circuit's decision that he lacked standing, and because the issue was moot. *See Newdow v. Bush*, 391 F. Supp. 2d 95, 99–101 (D.D.C. 2005). Newdow did not appeal that decision. Br. for Appellants at 52.

as to why their complaint should not be dismissed for lack of standing and on grounds of issue preclusion related to Newdow's prior challenges, which had been dismissed on standing grounds. *See* Order, *Newdow*, Civil Action No. 08-02248 (D.D.C. Jan. 16, 2009). Plaintiffs did not appeal the denial and the inaugural ceremony took place as planned. *See* Reply Br. for Appellants at 8. The district court then issued a second show cause order directing plaintiffs to explain why their complaint should not be dismissed as moot. *See* Show Cause Order, *Newdow*, Civil Action No. 08-02248 (D.D.C. Feb. 10, 2009). Plaintiffs responded to those orders and also moved to amend their complaint to add more plaintiffs as well as unnamed defendants and allegations concerning the 2013 and 2017 inaugural ceremonies.

Upon consideration of all parties' responses to the show cause orders, the district court dismissed the complaint. It found plaintiffs lacked standing to challenge the 2009 inaugural ceremony and that Newdow was precluded from challenging the inaugural prayers. *See* Order at 3, *Newdow*, Civil Action No. 08-02248 (Mar. 12, 2009). While the district court did not consider plaintiffs' amended complaint, it noted that the same standing issues afflicting the original complaint and the original plaintiffs would also afflict the new complaint and the new plaintiffs. *See id.* at 2 n.1.

Plaintiffs appealed to this court under 28 U.S.C. § 1291, and request that we reverse the district court's rulings on issue preclusion and standing and remand for a proceeding on the merits. We review the district court's dismissal of plaintiffs' suit *de novo. See Young Am.'s Found. v. Gates*, 573 F.3d 797, 799 (D.C. Cir. 2009).

II

The parties present three issues on appeal. The first is whether the lead plaintiff, Newdow, is precluded by the findings of prior cases from challenging inaugural prayers.

The second is whether plaintiffs' challenge to the 2009 inaugural ceremony is moot. The third is whether plaintiffs have standing to bring their claims concerning the 2013 and 2017 inaugurations. We consider each issue in turn.

A

Plaintiffs argue that despite prior cases in which Newdow was found to have lacked standing to challenge inaugural prayers, he is not precluded from challenging those prayers now because changes in circumstances and in the relevant law have cured or made obsolete the standing issues on which those prior challenges failed. Plaintiffs further argue that issue preclusion need not be considered because Newdow is not the only plaintiff in this case and if any of the other plaintiffs has standing, then the status of Newdow's standing is irrelevant. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977) (explaining that once one plaintiff has standing, there is "no occasion to decide the standing of the other [plaintiffs]").

We agree with plaintiffs' second argument, and therefore do not address the first. The question of preclusion with regard to Newdow is superfluous amidst other plaintiffs in the case whose standing has not been passed upon in prior cases. We put aside the issue of preclusion and move to the more relevant questions of mootness and standing.

B

The federal defendants and the PIC argue that plaintiffs' challenge to the religious elements of the 2009 inaugural ceremony is moot. The brief for the federal defendants—joined in full by the PIC in its brief, *see* Br. for the PIC at 14—reasons that with the 2009 inauguration having already occurred and the prayers and the oath already spoken, the court is not in the practical or constitutional position to

grant the declaratory and injunctive relief requested by plaintiffs. Br. for Fed. Defs. at 14–15.

This argument rings true. It is a basic constitutional requirement that a dispute before a federal court be "an actual controversy . . . extant at all stages of review, [and] not merely at the time the complaint is filed." *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974). This rule assures that "federal courts are presented with disputes they are capable of resolving," *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980), and not mere opportunities to engage in spirited sophistry. Whether the 2009 ceremony's incorporation of the religious oath and prayers was constitutional may be an important question to plaintiffs, but it is not a live controversy that can avail itself of the judicial powers of the federal courts. It is therefore moot.

At oral argument, plaintiffs conceded their claims regarding the 2009 inauguration would be moot under basic mootness doctrine. *See* Tr. of Oral Argument at 6, 27, 52. However, they contend their challenge is saved by an exception to mootness for cases that are capable of repetition but evade review. Reply Br. for Appellants at 3–9. The first prong of that exception requires that resolution of an otherwise moot case must have "a reasonable chance of affecting the parties' future relations." *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990). The second prong requires that "the challenged action [be] in its duration too short to be fully litigated prior to its cessation or expiration." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).

Plaintiffs cannot lay claim to this exception. Even if we assume plaintiffs' challenge is capable of repetition, they are barred from asserting it evaded review because plaintiffs failed to appeal the district court's denial of their preliminary injunction motion. Had plaintiffs pursued an appeal of that denial and had the preliminary injunction been granted, their case would not have become moot. This circuit—along with every other circuit to have considered the issue—has held that

"a litigant who could have but did not file for a stay to prevent a counter-party from taking any action that would moot his case may not, barring exceptional circumstances, later claim his case evaded review." *Armstrong v. FAA*, 515 F.3d 1294, 1297 (D.C. Cir. 2008) (citing consistent cases from other circuits).

We note that *Armstrong*'s language applies its rule to stays and does not specifically discuss preliminary injunctions or appeals from denials of preliminary injunctions. Plaintiffs seize on *Armstrong*'s silence regarding appeals from denials and suggest it means they fall under the exception. Reply Br. for Appellants at 8–9. That suggestion is incorrect. It is clear the principle of *Armstrong* requires a plaintiff to make a full attempt to prevent his case from becoming moot, an obligation that includes filing for preliminary injunctions and appealing denials of preliminary injunctions. *See Minn. Humane Soc'y v. Clark*, 184 F.3d 795, 797 (8th Cir. 1999) (applying the rule to numerous avenues of preliminary relief, including appeals). First, the difference between stays and injunctions is of no moment. "Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined," with the difference being that a stay "operates upon [a] judicial proceeding itself" while an injunction acts upon a "party's conduct." *Nken v. Holder*, 129 S. Ct. 1749, 1757–58 (2009). We see no reason why this distinction is relevant to the reasoning of *Armstrong*. Second, it is not logical to construe *Armstrong*'s principle as stopping short of requiring plaintiffs to pursue appeals of denials of injunctive relief. "[T]he capable-of-repetition doctrine applies only in exceptional situations," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), and the *Armstrong* rule ensures only situations that truly evade review in an exceptional way fall under the doctrine's umbrella. The capable-of-repetition doctrine is not meant to save mooted cases that may have remained live but for the neglect of the plaintiff. We therefore find the exception inapplicable in this

case.

## C

We turn to the question of plaintiffs' standing to challenge the 2013 and 2017 inaugurations.[3] Standing is determined under the familiar test established in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), which states a plaintiff must: 1) have suffered an injury in fact; 2) that is fairly traceable to the challenged action of the defendant; and 3) that will likely be redressed by a favorable decision. *Id.* at 560–61. The absence of any one of these three elements defeats standing. *Id.* at 561.

Plaintiffs do not claim President Obama's recitation of "So help me God" at the conclusion of his oath injured them. *See* Br. for Appellants at 38. The President cannot be denied

---

[3] Plaintiffs' did not make claims regarding future inaugural ceremonies in their original complaint but did so in a proposed amended complaint. The district court, however, dismissed plaintiffs' case without granting or denying their motion for leave to amend. *See* Order at 3, *Newdow*, Civil Action No. 08-02248 (D.D.C. Mar. 12, 2009). It would therefore appear the issue of plaintiffs' standing to challenge future inaugurations is not before this court, since the complaint was not formally amended. That places plaintiffs in the peculiar position of requesting that this court "recognize" their proposed amended complaint, Br. for Appellants at 7, since they are not in the position to appeal the district court's non-action of refusing to rule on their motion for leave to amend. *See* 28 U.S.C. § 1291 (granting courts of appeals jurisdiction only over appeals from "final decisions of the district courts"). We observe that the district court considered in its order—but did not decide—whether the amended complaint exhibited standing to challenge future inaugurations, *see* Order at 2 n.1, *Newdow*, Civil Action No. 08-02248 (Mar. 12, 2009), that both parties have fully briefed the standing issue, and that the motion for leave to amend should have been granted as of right under the version of the federal rules in effect at the time of plaintiffs' motion, *see* FED. R. CIV. P. 15(a)(1) (2009) (superseded Dec. 1, 2009). In light of these observations and in the interests of judicial economy, we shall consider the standing issue. It would serve no purpose beyond mere slavish adherence to form to do otherwise.

the prerogative of making such a religious reference, they concede, because doing so would abrogate his First Amendment rights. *See* Tr. of Oral Argument at 10–11. For sure, if it were otherwise, George Washington could not have begun the tradition by appending "So help me God" to his own oath; Lincoln could not have offered a war-weary nation "malice toward none" and "charity for all [] with firmness in the right as God gives us to see the right"; Kennedy could not have told us "that here on earth God's work" must be our own; nor could President Reagan have evoked "the shining city . . . built on rocks stronger than oceans, windswept, God-blessed, and teeming with people of all kinds living in harmony and peace" in his farewell address. Instead, plaintiffs claim they are injured because "God" was referenced by the Chief Justice and the prayer leaders in the course of the 2009 ceremony. These references, they argue, might have misled the uninformed to think the imprimatur of the state had been placed on the invocation of the Almighty and contributed to a social stigma against them as atheists. *See* Tr. of Oral Argument at 8–9. We will assume, without holding, that plaintiffs' claimed injury is an injury in fact and that it can be fairly traced to the conduct of the defendants. It is in the third element, redressability, where we find two problems with plaintiffs' case for standing.

First, plaintiffs request relief with regard to unnamed defendants over whom this court has no jurisdiction. Plaintiffs' amended complaint targets "Other Unknown Oath Administrators," "Other PIC Defendants," and "Other Unnamed Clergy" whom the President or President-elect[4] may ask in the future to conduct and facilitate religious oaths and prayers at the 2013 and 2017 inaugurations. First Amended Complaint at 21–22, 24, *Newdow*, Civil Action No. 08-02248

---

[4] This section references both the President and President-elect because the 2013 and 2017 inaugurations may involve either sitting Presidents beginning a second term or a newly elected person who will not yet be President until after the inaugural ceremony.

(D.D.C. Mar. 10, 2009). It asks that we enjoin these defendants from taking part in those elements of the ceremony and to declare their possible actions in support of such religious elements unconstitutional. *See id.* at 55. It is impossible for this court to grant such relief. As a general matter, a court will not entertain a suit unless the defendant has been made a party by service of process. *See* FED. R. CIV. P. 4(m); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969). Courts do grant an exception to this rule for "John Doe" defendants, but only in situations where the otherwise unavailable identity of the defendant will eventually be made known through discovery.[5] *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). This case is not such a situation. No amount of discovery will uncover the identities of the unnamed defendants. Therefore, by naming as defendants all persons the future President could possibly invite to administer an oath, lead a prayer, or help in the planning of these events, plaintiffs are essentially seeking a declaration of their rights accompanied by an injunction against the world. There is another name for that type of generally applicable relief: legislation. And that's not within the power of the courts. *See Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436–37 (1934) (holding that general injunctions "violate[] established principles of equity jurisdiction and procedure").

The second redressability problem is that declaratory and injunctive relief against the defendants actually named would not prevent the claimed injury. Plaintiffs have sued the

---

[5] It is under this exception that plaintiffs might have been able to pursue "Other Governmental 'Roe' Defendants" who "along with or in addition to the other Defendants . . . control access to the inaugural platform and to [broadcast] audio-visual systems," had their complaint otherwise met standing requirements. First Amended Complaint at 23, *Newdow*, Civil Action No. 08-02248 (D.D.C. Mar. 10, 2009). It is conceivable discovery would have revealed other governmental actors that were made responsible for the security and logistical arrangements of the ceremony.

Chief Justice for the injury inflicted by the utterance of the phrase "So help me God," and they have sued the JCCIC, the PIC, AFIC, and the named clergymen for the injury inflicted by inaugural prayers. But while these defendants have had some role in facilitating the injury in the past and may again in the future, they possess no authority—statutory or otherwise—to actually decide whether future inaugural ceremonies will contain the offending religious elements. The defendants make clear (and plaintiffs do not contest) that the Chief Justice has no legal authority or duty to decide what may be added to the presidential oath. *See* Declaration of Jeffrey P. Minear, Counselor to the Chief Justice, Civil Action No. 08-2248 (D.D.C. Jan. 8, 2009), App. for Appellants at 42. It is also clear that the resolution and statute authorizing the JCCIC and the AFIC, respectively, do not confer on those entities the authority or duty to sponsor or determine the contents of the inaugural ceremony. The committees are only authorized—not obligated—to assist or make arrangements for a ceremony should one take place. *See* S. Con. Res. 67, 110th Cong. (2008); 10 U.S.C. § 2553. The PIC also has no authority or duty to sponsor or determine the contents of the inaugural ceremony. It is merely recognized by statute as a coordinating committee should a future President designate such a group. And, almost needless to say, the named clergymen do not have any authority or duty to institute inaugural prayers or lead them. Indeed, no law obligates the President or President-elect to utilize the services of the Chief Justice, the JCCIC, the AFIC, the PIC, or certain clergymen. To make the point clearer, there is no law mandating that the President or the President-elect even carry out an inaugural ceremony. The inaugural ceremony is a peculiar institution, the whole of which is subject to the President's or President-elect's discretion (as plaintiffs concede, *see* Tr. of Oral Argument at 53 ("[U]ltimately it's the President who makes all the decisions.")). The named defendants are powerless to direct, say no to, or otherwise stop the future

President if he wishes to have his ceremony contain the offending elements.

Therefore, issuing an injunction to prevent them from implementing the future President's inaugural plan would be folly, akin to enjoining a sound technician from turning the Chief Justice's microphone on when administering the oath. The defendants, like the sound technician, are not responsible for the offending conduct and the future President could simply find other willing assistants not subject to the injunction to carry out his wishes. In other words, he could find someone else to turn the microphone on. The future President is therefore a "third party not before the court" whose "independent action" results in the alleged injury, *Lujan*, 504 U.S. at 560, and courts cannot "redress injury . . . that results from [such] independent action," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976).[6]

Declaratory relief against the named defendants will also not provide redress since a declaration with regard to defendants' conduct will have no controlling force on the President or President-elect. Plaintiffs dispute this, arguing that the possibility the future President will choose to abide by a declaratory judgment establishes the appropriate level of redressability to confer standing. For this proposition, they cite two cases, both of which are inapplicable to this case.

First, plaintiffs cite language in *Clinton v. City of New York*, 524 U.S. 417 (1998), stating that "traceability and redressability are easily satisfied [when] injury is traceable to the President's [actions] and would be redressed by a declaratory judgment that the [actions] are invalid." *Id.* at 433 n.22. We put aside the fact that plaintiffs in that case (unlike

---

[6] The *Lujan* Court discussed "independent action" by a "third party" in reference to the causation prong of standing doctrine rather than redressability. However, the Supreme Court acknowledged in subsequent cases, such as *Simon*, that causation and redressability are closely related, and can be viewed as "two facets" of a single requirement, *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984).

plaintiffs in this case) actually named the President in their suit. Instead, we highlight that *Clinton* was a challenge to the constitutionality of the Line Item Veto Act, and the declaratory judgment in that case struck down that statute and nullified the statutory power of the President to wield a line item veto pen. *See id.* at 448–49. It was, in other words, a basic case of judicial review of legislation. This case, however, challenges no statutory power, but rather a decision committed to the executive discretion of the President or the personal discretion of the President-elect. A court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) ("An attempt on the part of the judicial department . . . to enforce the performance of [executive and political] duties by the President [is] 'an absurd and excessive extravagance.'") (quoting Chief Justice John Marshall); *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) (identifying separation of powers issues raised by requests for declaratory relief against the President). And plaintiffs fail to cite any authority allowing this court to declare unlawful the personal religious expression of a private citizen like the President-elect.

The second case plaintiffs cite is *Franklin v. Massachusetts*, 505 U.S. 788 (1992), which contains language endorsing the idea that declaratory relief against an officer subordinate to the President—in that case, the Secretary of Commerce—made it "substantially likely that the President . . . would abide by an authoritative interpretation" of the relevant law "even though [he] would not be directly bound by such a determination." *Id.* at 803. This citation is unpersuasive. First, that portion of the opinion did not garner the support of a majority of the Supreme Court and is therefore not controlling on this court. *See id.* at 789–90 (listing only three Justices joining Part III of Justice O'Connor's opinion containing its standing discussion); *see also id.* at 825 (Scalia, J., concurring in part and concurring in the judgment) ("Redressability

requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power."). Second, it is distinguishable. In that case, the Commerce Secretary was obligated by statute to provide the President with a report of the nation's total population, *see id.* at 799 (citing 13 U.S.C. § 141(a)), which the President consults before sending his own statutorily required report to Congress showing the population of each state for purposes of apportioning the number of representatives in the House of Representatives, *see id.* (citing 2 U.S.C. § 2(a)). In other words, the Commerce Secretary was legally responsible for providing the President with advice and information on which he would base his final decision. Therefore, a plurality of the Supreme Court thought declaratory relief applicable to the Secretary's legal duty would make it "likely" the President would take the action desired by the plaintiffs, even if he was not obligated to do so. *See id.* at 803. There is no corresponding advisory relationship between the named defendants and the President or President-elect in this case. The future President is free to use any decisionmaking process he desires when designing and staging an inaugural ceremony and is not obligated to consult anybody or take any cognizance of the opinions issuing from this court.

The only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against all possible President-elects and the President himself. But such relief is unavailable. Beyond the fact that plaintiffs fail to name future President-elects or the President in their suit, plaintiffs cannot sue all possible President-elects for the same reason they cannot sue all possible inaugural participants; as discussed, general injunctions are outside the judicial power. With regard to the President, courts do not have jurisdiction to enjoin him, *see Mississippi*, 71 U.S. (4 Wall.) at 501, and have never submitted the President to declaratory relief, *see Franklin*, 505 U.S. at 827–28 (Scalia, J.,

concurring in part and concurring in the judgment).

## III

Plaintiffs' claims regarding the 2009 inaugural ceremony are moot and plaintiffs do not have standing to bring their claims pertaining to the 2013 and 2017 ceremonies because their injury is not redressable by this court. The district court's dismissal of their case is therefore

*Affirmed.*

KAVANAUGH, *Circuit Judge*, concurring in the judgment:

Under the Supreme Court's precedents, plaintiffs have standing to raise an Establishment Clause challenge to the Inaugural prayers and to the inclusion of the words "so help me God" in the official Presidential oath administered at the public Inauguration ceremonies. I would reject plaintiffs' claims on the merits because those longstanding practices do not violate the Establishment Clause as it has been interpreted by the Supreme Court.

I

The Government initially argues that plaintiffs lack standing to challenge the Presidential oath and Inaugural prayers. I disagree. Under the relevant Supreme Court precedents, plaintiffs have demonstrated injury-in-fact, causation, and redressability, the three components of standing.

A

To show injury-in-fact, plaintiffs must allege an injury that is concrete and particularized. Plaintiffs are atheists. They claim that they will attend the next Presidential Inauguration and witness the Presidential oath and Inaugural prayers – government-sponsored religious expression to which they object. Those allegations suffice under the Supreme Court's precedents to demonstrate plaintiffs' concrete and particularized injury.

An alleged Establishment Clause injury is sufficiently concrete and particularized when the plaintiff sees or hears a government-sponsored religious display or speech that offends his or her beliefs. *See In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008). The Supreme Court has consistently decided Establishment Clause cases involving

objections to government-sponsored religious displays or speech in public settings. *See Van Orden v. Perry*, 545 U.S. 677, 682, 691 (2005) (plurality opinion) (plaintiff "encountered" Ten Commandments monument during visits to state capitol in which he "walked by the monument"); *McCreary County v. ACLU*, 545 U.S. 844, 852 (2005) (county citizens saw Ten Commandments display that was "readily visible" to them when they used courthouse to conduct civic business); *County of Allegheny v. ACLU*, 492 U.S. 573, 587-88 (1989) (local residents saw crèche in county courthouse and menorah on town property); *Lynch v. Donnelly*, 465 U.S. 668, 671 (1984) (local residents saw crèche on town property); *Marsh v. Chambers*, 463 U.S. 783, 784-86 (1983) (member of legislature heard prayer at opening of each legislative session); *cf. Salazar v. Buono*, No. 08-472, slip op. at 3 (U.S. Apr. 28, 2010) (opinion of Kennedy, J.) (recognizing that plaintiff's standing to challenge public display of a cross was accepted in prior lower-court decision).[1] Moreover, the fact that a large number of people might see or hear the religious display or speech does not negate a plaintiff's standing. *See FEC v. Akins*, 524 U.S. 11, 24 (1998).

It is true that the Court did not pause to expressly address standing in those religious display and speech decisions. And "cases in which jurisdiction is assumed *sub silentio* are not binding authority for the proposition that jurisdiction exists." *In re Navy Chaplaincy*, 534 F.3d at 764 (internal quotation marks omitted). But the Supreme Court's consistent adjudication of religious display and speech cases over a span

---

[1] The display and speech cases are distinct from those in which a person simply becomes aware of government *conduct* to which the plaintiff objects. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485-86 (1982); *In re Navy Chaplaincy*, 534 F.3d at 764.

of decades suggests that the Court has thought it obvious that the plaintiffs in those matters had standing. Indeed, none of the dissenters in those cases ever contended that the plaintiffs lacked standing. To ignore the import of those cases for the standing analysis, one would have to believe the Supreme Court repeatedly overlooked a major standing problem and decided a plethora of highly controversial and divisive Establishment Clause cases unnecessarily and inappropriately. I find that prospect extremely unlikely. In light of the Supreme Court's precedents, plaintiffs here have alleged a sufficiently concrete and particularized injury.

To satisfy the injury-in-fact requirement when challenging a future event, plaintiffs also must show that the alleged injury is "imminent." That inquiry mirrors the test for constitutional ripeness. *See Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427-28 (D.C. Cir. 1996); *see, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 & n.8 (2007). To demonstrate imminence, plaintiffs must allege an injury that is "substantially probable." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009). In this case, it is substantially probable that the Presidential oath at the next Inauguration will include "so help me God" and that there will be prayers during the Inaugural ceremony. History, tradition, and common sense tell us as much. As explained more fully below, both "so help me God" and Inaugural prayers have long been staples of Inaugural ceremonies, and there is no reason to think those practices will cease soon.

Imminence is not defeated by the fact that the next Inauguration remains a few years away. In *Lee v. Weisman*, the Supreme Court decided a challenge to prayer at a high school graduation that loomed in the distant future. 505 U.S. 577, 584 (1992). As that case exemplifies, imminence

"requires only that the anticipated injury occur with[in] some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992).

B

As to the causation and redressability elements of standing, plaintiffs' alleged injury is fairly traceable to the defendants here – namely, the officer who recites the official Presidential oath (the Chief Justice) and the entity that runs the events and organizes the speakers (the Presidential Inaugural Committee). *See, e.g.*, *Lee*, 505 U.S. at 586 (permitting Establishment Clause suit against officials who "direct the performance of a formal religious exercise"). An injunction against the named defendants is therefore also likely to redress plaintiffs' alleged injuries. *See Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) ("Typically, redressability and traceability overlap as two sides of a causation coin.").[2]

---

[2] Plaintiffs acknowledge that a President on his or her own might still say "so help me God" even if those words are not part of the official oath recited by the Chief Justice. *See* Tr. of Oral Arg. at 10-11; Plaintiffs' Br. at 37-38. In this suit, plaintiffs do not seek to constrain a President's choice of what he or she says at the Inaugural ceremonies, whether during the oath or the Inaugural Address. Nor do plaintiffs argue that a *private* ceremony that included "so help me God" or prayer would be impermissible. Rather, plaintiffs challenge the inclusion of "so help me God" in the official Presidential oath articulated by the Chief Justice in a public ceremony, as well as the Inaugural prayers delivered by the selected clergy during that public ceremony.

To be sure, it is possible that the Presidential Inaugural Committee's responsibilities might be transferred to a successor entity before the next Inauguration, akin to the way the named defendant changes when there is turnover in a government office. *Cf.* FED. R. CIV. P. 25(d). But redressability is still satisfied because "a declaration of the [plaintiffs'] legal right . . . could form the basis of an injunction" against the entity to which the committee's responsibilities are transferred. *Center for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 839 n.* (D.C. Cir. 2008). In addition, as in any challenge to future government action, it is theoretically possible that Congress or the President could completely change the nature of the Inaugural ceremonies before the next Inauguration. But the question is one of "likelihood." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *Lujan*, 504 U.S. at 561. The next Inaugural ceremony likely will resemble past Inaugurals, just as the Supreme Court in *Lee v. Weisman* concluded that the high school's next graduation prayer likely would resemble past graduation prayers.

Because plaintiffs have standing, I turn to the merits of plaintiffs' Establishment Clause claims.

II

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The Supreme Court has interpreted that elusive text on many occasions. The question here is whether the Presidential oath and Inaugural prayers contravene the relevant Supreme Court precedents.

6

A

In analyzing the Establishment Clause issues in this case, I begin with several background principles.

First is an obvious point, but one worth emphasizing. In our constitutional tradition, all citizens are equally American, no matter what God they worship or if they worship no god at all. Plaintiffs are atheists. As atheists, they have no lesser rights or status as Americans or under the United States Constitution than Protestants, Jews, Mormons, Muslims, Hindus, Buddhists, Catholics, or members of any religious group.

Second, in deciding this case, we cannot gloss over or wish away the religious significance of the challenged Inaugural prayers. The fact that religious words are common to many faiths – or are used repeatedly – does not diminish their religious meaning. Neither the numbing effect of repetition nor the brevity of a prayer extinguishes the religious nature of words such as "help me God."

Third, and relatedly, we cannot resolve this case by discounting the sense of anguish and outrage plaintiffs and some other Americans feel at listening to a government-sponsored religious prayer. Any effort to tell plaintiffs that "it's not a big deal" or "it's de minimis" would be entirely out of bounds, in my judgment. Plaintiffs' beliefs and sincere objections warrant our respect.

Fourth, at the same time, we likewise cannot dismiss the desire of others in America to publicly ask for God's blessing on certain government activities and to publicly seek God's guidance for certain government officials. Plaintiffs suggest that no one should be upset if government ceremonies were

entirely cleansed of religious expression; they argue that such a regime would reflect true government "neutrality" toward religion. Others respond, however, that stripping government ceremonies of any references to God or religious expression would reflect unwarranted hostility to religion and would, in effect, "establish" atheism. *Cf. Salazar v. Buono*, No. 08-472, slip op. at 14-15 (U.S. Apr. 28, 2010) (opinion of Kennedy, J.) ("The goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm. . . . The Constitution does not oblige government to avoid any public acknowledgment of religion's role in society."); *Lee v. Weisman*, 505 U.S. 577, 598 (1992) ("A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution.").

B

With that background in mind, I turn to the Establishment Clause analysis of the Presidential oath and Inaugural prayers. To begin, the Supreme Court's Establishment Clause jurisprudence does not set forth a one-size-fits-all test. *See Salazar*, No. 08-472, slip op. at 18 (opinion of Kennedy, J.); *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality opinion); *Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 718 (1994) (O'Connor, J., concurring in part and concurring in judgment). Rather, the Court ordinarily analyzes cases under various issue-specific rules and standards it has devised.

This case concerns government-sponsored religious speech at public events outside of the public school setting. The Supreme Court's landmark ruling in *Marsh v. Chambers*, 463 U.S. 783 (1983), sets forth the Court's approach to that issue. In *Marsh*, the Court upheld a state legislature's practice

of beginning each session with prayer by a state-paid chaplain. The Court reasoned that the practice of opening legislative sessions with prayer was "deeply embedded in the history and tradition of this country." *Id.* at 786. Since the Founding, the "practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." *Id.* The practice is "part of the fabric of our society" such that the invocation of God was "not, in these circumstances, an 'establishment' of religion . . . [but] simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.* at 792.[3]

---

[3] *Marsh* is consistent with the Supreme Court's broader approval, albeit sometimes in dicta, of a variety of governmental references to God and prayers in the public square – sometimes known by the umbrella term "ceremonial deism." *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 37 (2003) (O'Connor, J., concurring in judgment); *County of Allegheny v. ACLU*, 492 U.S. 573, 603 (1989); *id.* at 630 (O'Connor, J., concurring in part and concurring in judgment); *Lynch v. Donnelly*, 465 U.S. 668, 716 (1984) (Brennan, J., dissenting). These include: Congress's selection of "In God we trust" as the National Motto, 36 U.S.C. § 302, the inclusion of "under God" in the Pledge of Allegiance, 4 U.S.C. § 4, and the President's Thanksgiving Day Proclamations. *See Van Orden*, 545 U.S. at 699 (binding opinion of Breyer, J.) (motto and Thanksgiving Proclamation); *County of Allegheny*, 492 U.S. at 602-03 (motto and Pledge); *Lynch*, 465 U.S. at 676 (motto, Pledge, and Thanksgiving Proclamation); *Zorach v. Clauson*, 343 U.S. 306, 312-13 (1952) (Thanksgiving Proclamation); Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 COLUM. L. REV. 2083, 2094-96 (1996). Under the Court's precedents, these "ceremonial deism" principles do not always translate to the public school setting where young students face inherent coercion. *See Lee*, 505 U.S. 577; *Engel v. Vitale*, 370 U.S. 421 (1962).

The Court's religious display cases have followed an approach similar to the speech cases. *See Salazar*, No. 08-472; *Van Orden*,

As to the permissible *content* of the legislative prayers, the *Marsh* Court articulated a somewhat ambiguous standard: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." *Id.* at 794-95.

The Supreme Court's holding in *Marsh* – allowing government-sponsored religious speech or prayer at a public event where prayers have traditionally occurred, at least so long as the prayers are not proselytizing (seeking to convert) or otherwise exploitative – does not satisfy all Americans. No holding on this issue would in our pluralistic society. But the precedent has endured, and as a lower court we must follow and apply it in this case.

---

545 U.S. 677; *McCreary County v. ACLU*, 545 U.S. 844 (2005); *County of Allegheny*, 492 U.S. 573; *Lynch*, 465 U.S. 668. But because of their fixed quality, displays have caused somewhat more concern than spoken words, which by their nature are fleeting. *Cf. Salazar*, No. 08-472, slip op. at 11-12 (opinion of Kennedy, J.); *Van Orden*, 545 U.S. at 701 (binding opinion of Breyer, J.); *id.* at 722-23 (Stevens, J., dissenting); *McCreary County*, 545 U.S. at 868-69, 877 n.24; *County of Allegheny*, 492 U.S. at 661 (Kennedy, J., concurring in judgment in part and dissenting in part) ("I doubt not, for example, that the Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall. This is not because government speech about religion is *per se* suspect, as the majority would have it, but because such an obtrusive year-round religious display would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion.").

C

Like the legislative prayer in *Marsh*, the words "so help me God" in the Presidential oath are not proselytizing or otherwise exploitative. Moreover, like the practice of legislative prayer, use of "so help me God" in oaths for government officials is deeply rooted in the Nation's history and tradition. By many accounts, George Washington said "so help me God" when he took the first Presidential oath in New York on April 30, 1789. The First Congress – the same Congress that drafted and approved the First Amendment – mandated "so help me God" in the oaths of office for federal judges. *See* 1 ANNALS OF CONG. 928-29 (Sept. 17, 1789) (Joseph Gales ed., 1789) (final congressional approval of statute requiring oath for judges); *id.* at 948 (Sept. 24, 1789) (final congressional approval of First Amendment); *see also* Judiciary Act of 1789, § 8, 1 Stat. 73, 76 (1789) (signed into law on Sept. 24, 1789). State constitutions in effect at the ratification of the First Amendment similarly included "so help me God" in state officials' oaths of office. *See, e.g.*, MASS. CONST. pt. 2, ch. VI, art. I (1780); N.H. CONST. pt. 2 (1784); VT. CONST. ch. II, § XII (1786).

The words "so help me God" remain to this day a part of oaths prescribed by law at the federal and state levels. *See, e.g.*, 5 U.S.C. § 3331 (federal civil service and military officers); 28 U.S.C. § 453 (federal justices and judges); *id.* § 951 (federal court clerks and deputies); ALA. CONST. art. XVI, § 279; ARIZ. REV. STAT. § 38-231(E); CONN. CONST. art. 11, § 1; DEL. CONST. art. XIV, § 1; FLA. CONST. art. II, § 5(b); KAN STAT. ANN. § 54-106; KY. CONST. § 228; LA. CONST. art. X, § 30; ME. CONST. art. IX, § 1; MASS. CONST. amend. art. VI; MISS. CONST. art. 14, § 268; MONT. CONST. art. III, § 3; NEV. CONST. art. XV, § 2; N.H. CONST. pt. II, art. 84; N.J. STAT. ANN. § 52:15-2; N.M. STAT. § 14-13-1; N.C. GEN. STAT. §

11-11; N.D. CONST. art. XI, § 4; R.I. CONST. art. III, § 3; S.C. CONST. art. VI, § 5; TEX. CONST. art. XVI, § 1; VT. CONST. ch. II, § 56; VA. CONST. art. II, § 7; WIS. STAT. § 19.01; WYO. STAT. ANN. § 1-2-103.[4]

In light of that extensive historical record and the non-proselytizing, non-exploitative nature of the oath, it comes as no surprise that the Supreme Court several times has suggested, at least in dicta, that the Constitution permits "so help me God" in officially prescribed oaths of office. *See Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 212-13 (1963) (that "religion has been closely identified with our history and government . . . . is evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, 'So help me God'"); *Zorach v. Clauson*, 343 U.S. 306, 312-13 (1952) (it is "common sense" that the First Amendment "does not say that in every and all respects there shall be a separation of Church and State" as evidenced by the inclusion of "'so help me God' in our courtroom oaths"). Many Justices have reiterated the point in separate opinions over the years. *See McCreary County v. ACLU*, 545 U.S. 844, 886 (2005) (Scalia, J., dissenting); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 26 (2004) (Rehnquist, C.J., concurring

---

[4] An officer or employee of course may decline to say "so help me God" on free exercise, anti-coercion grounds. *See Torcaso v. Watkins*, 367 U.S. 488 (1961); *see also* U.S. CONST. art. VI, cl. 3. So too, no one in the audience at a public ceremony may be compelled to utter religious words. *See West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943). Those bedrock rights are analytically quite different, however, from a third-party observer's asserted anti-establishment right to prevent inclusion of "so help me God" in an official oath taken by someone else or to halt a prayer said by someone else.

in judgment); *id.* at 36 n.* (O'Connor, J., concurring in judgment).

Under *Marsh* and other Supreme Court precedents, the Establishment Clause permits "so help me God" in the official Presidential oath.

D

Plaintiffs' challenge to the traditional Inaugural prayers (usually consisting of an invocation and benediction) also fails. Those prayers closely resemble the legislative prayers upheld by the Supreme Court in *Marsh*.

Like legislative prayers, prayers at Presidential Inaugural ceremonies are deeply rooted in American history and tradition. *See County of Allegheny v. ACLU*, 492 U.S. 573, 671-72 n.9 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part) ("our Presidential inaugurations have traditionally opened with a request for divine blessing"). Indeed, formal prayers "have been associated with presidential inaugurations since the inauguration of George Washington." Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 COLUM. L. REV. 2083, 2106 (1996). During the first Inauguration, the new President, Vice President, and Members of Congress – in accordance with a resolution passed by the First Congress – "proceeded to St. Paul's Chapel, where divine service was performed" by the Senate chaplain. 1 ANNALS OF CONG. 29 (Joseph Gales ed., 1789); *see also* Epstein, *Ceremonial Deism*, 96 COLUM. L. REV. at 2106-07. "It is to be noted that this was not a service provided by an Episcopal church to which senators and representatives were invited, but an official service carefully arranged for by both houses of Congress and conducted by their duly elected chaplain." 1

13

ANSON PHELPS STOKES, CHURCH AND STATE IN THE UNITED STATES 485 (1950). Inaugural prayers were conducted by the Senate chaplain in the Senate chambers until 1937; since then, the prayers typically have taken place on the Inaugural platform at the Capitol grounds. *See* App. at 20-23; Epstein, *Ceremonial Deism*, 96 COLUM. L. REV. at 2107 & n.137.

To be sure, unlike *Marsh*, this case involves the Executive, not the Legislature. But there is no persuasive reason why opening every "executive session" with prayer would raise more of an Establishment Clause problem than opening every "legislative session" with prayer.

Having established that Inaugural prayers are permissible in concept, we confront a distinct and delicate question regarding the precise content of the prayers. Recall that *Marsh* stated that "[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." *Marsh*, 463 U.S. at 794-95.

Under *Marsh*, we know that proselytizing prayers – that is, those that seek to convert – are problematic. Inaugural prayers traditionally have not crossed that boundary.

But what about sectarian references – that is, prayers associated only with particular faiths, or references to deities, persons, precepts, or words associated only with particular faiths? (References such as God and Lord are generally considered non-sectarian for these purposes.) Does a sectarian reference mean for purposes of *Marsh* that the "prayer opportunity has been exploited to proselytize or

advance any one, or to disparage any other, faith or belief"? If so, the Presidential Inaugural prayers might pose a problem because they have included sectarian references. For example, the prayers at the 2009 Inauguration contained a reference to Jesus, a recitation of a Protestant version of the "Our Father," and a quotation from the Shema, an important prayer in Judaism. *See* 155 CONG. REC. S667 (daily ed. Jan. 20, 2009).

*Marsh* indicates, however, that the Establishment Clause does not ban any and all sectarian references in prayers at public ceremonies. Some of the prayers at issue in *Marsh* itself were Christian, and others were in the Judeo-Christian tradition. *See Van Orden*, 545 U.S. at 688 n.8 (plurality opinion) (noting that "prayers [in *Marsh*] were often explicitly Christian").

In the wake of *Marsh*, moreover, our en banc Court upheld the practice of Congressional prayers, which then (as now) sometimes included sectarian references. *See Murray v. Buchanan*, 720 F.2d 689 (D.C. Cir. 1983) (en banc) (per curiam). The Fourth, Tenth, and Eleventh Circuits have similarly concluded that *Marsh* does not prohibit any and all sectarian references. *See Pelphrey v. Cobb County*, 547 F.3d 1263, 1271-72 (11th Cir. 2008); *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 281-82 n.3 (4th Cir. 2005); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) (en banc); *see also Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 211 (5th Cir. 2006) (opinion of Clement, J.). *But see Wynne v. Town of Great Falls*, 376 F.3d 292, 298-99 (4th Cir. 2004).[5]

---

[5] As several courts have concluded, the Supreme Court's post-*Marsh* decision in *County of Allegheny* does not mandate that a prayer be entirely non-sectarian. *See Pelphrey*, 547 F.3d at 1271-

The more nuanced issue, therefore, is how courts should distinguish permissible sectarian references from impermissible sectarian references in determining under *Marsh* whether a "prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." As Judge Pryor explained in his thoughtful opinion for the Eleventh Circuit, courts must approach that difficult task with sensitivity lest they become "ecclesiastical arbiter[s]." *Pelphrey*, 547 F.3d at 1274. In that regard, the en banc Tenth Circuit's formulation is instructive: "the kind of [] prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that *aggressively advocates* a specific religious creed, or that derogates another religious faith or doctrine." *Snyder*, 159 F.3d at 1234 (emphasis added); *see also Doe*, 473 F.3d at 213-14 (opinion of Clement, J.) (expressing approval of the Tenth Circuit test). Under *Marsh*, therefore, sectarian references alone typically do not render a prayer impermissible. But at some point sectarian references can become so overwhelming and one-sided that the prayer opportunity can be said to have been "exploited" to "advance any one, or to disparage any other, faith or belief." That is particularly true when other factors suggest exploitation of the prayer opportunity. *See Pelphrey*, 547 F.3d at 1277.

---

72 (plaintiffs "argue that *Allegheny* requires us to read *Marsh* narrowly to permit only nonsectarian prayer, but they are wrong"); *Simpson*, 404 F.3d at 281-82 n.3 ("Nothing in *Allegheny* suggests that it supplants *Marsh* in the area of legislative prayer."); *see also Turner v. City Council of Fredericksburg*, 534 F.3d 352, 356 (4th Cir. 2008) (O'Connor, J., sitting by designation) ("We need not decide whether the Establishment Clause *compelled* the Council to adopt their [non-sectarian] legislative prayer policy, because the Establishment Clause does not absolutely dictate the form of legislative prayer.").

Review of the modern Inaugural prayers yields no indication that this admittedly imprecise *Marsh* principle is being breached. Inaugural prayers are traditionally inclusive and largely non-sectarian. They typically include many references to God, Lord, and the like, which are considered non-sectarian for these purposes. The sectarian references in Inaugural prayers tend to be limited in number, as was the case at the 2009 Inauguration for example. In short, it cannot be said for purposes of *Marsh* that the Presidential Inauguration is being "exploited to proselytize or advance any one, or to disparage any other, faith or belief."[6]

## III

In an emergency motion filed before the oral argument in this case, plaintiffs moved that we dispense with the Court's invocation, "God save the United States and this honorable Court." According to plaintiffs, that traditional invocation is unconstitutional. We denied the motion, and I take this opportunity to explain my vote.

The traditional prayer before this Court's sessions (and before the Supreme Court's sessions) is analogous to "so help me God" in the Presidential oath and to the legislative prayers upheld in *Marsh*. As with the legislative prayers in *Marsh*, the use of "God save the United States and this honorable Court" before court sessions does not proselytize or otherwise exploit the prayer opportunity so as to advance any one, or to disparage any other, faith or belief. And this prayer is deeply

---

[6] The constitutional question whether some sectarian references in Inaugural prayers are permissible under *Marsh* is of course separate from the policy question whether such references should be included.

rooted in American history and tradition. *See McCreary County v. ACLU*, 545 U.S. 844, 886 (2005) (Scalia, J., dissenting) (prayer used under John Marshall); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 29 (2003) (Rehnquist, C.J., concurring in judgment) (prayer used in Supreme Court at least since 1827). Therefore, under the *Marsh* test, the prayer "God save the United States and this honorable Court" before court sessions is constitutionally permissible. Indeed, *Marsh* itself specifically referenced "God save the United States and this honorable Court" as a quintessential example of a permissible religious reference. *See Marsh v. Chambers*, 463 U.S. 783, 786 (1983); *see also Zorach v. Clauson*, 343 U.S. 306, 313 (1952). Many Justices in individual opinions have indicated their agreement with that conclusion. *See Van Orden v. Perry*, 545 U.S. 677, 716 (2005) (Stevens, J., dissenting); *McCreary County*, 545 U.S. at 886 (Scalia, J., dissenting); *Elk Grove*, 542 U.S. at 29 (Rehnquist, C.J., concurring in judgment); *id.* at 37 (O'Connor, J., concurring in judgment); *County of Allegheny v. ACLU*, 492 U.S. 573, 672 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part); *Wallace v. Jaffree*, 472 U.S. 38, 84 (1985) (Burger, C.J., dissenting); *Lynch v. Donnelly*, 465 U.S. 668, 693 (1984) (O'Connor, J., concurring); *id.* at 714 (Brennan, J., dissenting).

In light of the relevant Supreme Court precedents, plaintiffs' challenge to "God save the United States and this honorable Court" is unavailing.

\* \* \*

Applying *Marsh* and the other relevant Supreme Court precedents, I would hold that both "so help me God" in the Presidential oath and the prayers at the Presidential Inauguration do not violate the Establishment Clause. I also

agree with our Court's decision to deny plaintiffs' challenge to the invocation "God save the United States and this honorable Court."